**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Kenneth G. SWEPSTON, Sr.; Kenneth
G. Swepston, Jr., Defendants–
Appellees.**

**Nos. 92–7051, 92–7052.**

United States Court of Appeals,
Tenth Circuit.

March 12, 1993.

Richard A. Friedman, Attorney, Dept. of Justice, Washington, DC (John Raley, U.S. Atty., Sheldon J. Sperling, Bruce Green, Asst. U.S. Attys., Muskogee, OK, with him on the brief), for plaintiff-appellant.

Don F. Baker and Jerry S. Moore of Baker & Baker, Tahlequah, OK, for defendants-appellees.

Before TACHA and BALDOCK, Circuit Judges, and SAFFELS, District Judge.*

BALDOCK, Circuit Judge.

The government appeals from the district court's order granting Defendants' motions to suppress evidence seized without a warrant, evidence seized pursuant to a warrant, and oral statements made by Defendants to arresting officers. We have jurisdiction under 18 U.S.C. § 3731.

* The Honorable Dale E. Saffels, Senior United States District Judge for the District of Kansas, sitting by designation.

Defendants, Kenneth G. Swepston, Sr. ("Senior"), and Kenneth G. Swepston, Jr. ("Junior"), live on Molly Brown Mountain in the Cookson Hills of Cherokee County, Oklahoma. This is a sparsely populated area consisting mainly of timbered countryside with scattered clearings. Senior and Junior have separate residences located approximately one mile apart. Between the two residences is property that appears to be abandoned and which does not belong to either Senior or Junior.

The record reveals that Senior's residence is located on a two-acre tract of land that is surrounded by dense timber and underbrush. Senior's property contains two sheds located to the southeast of the house. The larger of the two sheds is a partially roofed chicken shed which is approximately one hundred feet from Senior's house. The chicken shed, along with Senior's house, is partially enclosed by a barbed wire fence. The area between the house and the chicken shed which consists mainly of trees and underbrush, is maintained and kept cleared by Senior, and there is a path leading from the house to the chicken shed. Neither the house nor the chicken shed can be seen from a public road or from any adjoining neighbor's property.

The record also reflects that Junior's residence is enclosed by a chain-link fence. To the east of Junior's fenced residence is cleared land used as a chicken yard, containing numerous small chicken huts. A portion of the chicken yard is in a valley. The chain-link fence encloses a section of this valley, and the remainder of the valley is enclosed by a barbed wire fence which attaches to the chain-link fence at its southeast and northeast corners and runs along a tree line to the east. At its furthermost distance, the barbed wire fence is over four hundred feet from the chain-link fence and over five hundred feet from Junior's house. Guard dogs are on the perimeter of this area, and there is no public access to this area other than through a locked gate. The portion of the chicken yard enclosed by the barbed wire fence cannot be seen from a public road or from any adjoining neighbor's property.

In August 1991, a Bureau of Indian Affairs marijuana eradication reconnaissance team ("MERT") conducted various helicopter reconnaissance operations including one over the Molly Brown Mountain area on August 7, 1990. The MERT officers targeted defendants' properties for aerial surveillance based on information they had received concerning the presence of marijuana. The district court found that during the course of the operation over the area, the helicopter operated at an altitude substantially less than five hundred feet.[1] The MERT officers first spotted marijuana on the abandoned property between Junior's and Senior's residences, then in Senior's chicken shed, and finally on Junior's property. The MERT officers also spotted several individuals on Senior's property entering a pickup truck and attempting to leave the residence.

After spotting the marijuana and the individuals on Senior's property, the helicopter crew alerted officers on the ground, who intercepted the pickup truck as it departed from Senior's residence. The three occupants of the pickup were handcuffed, placed in one of the patrol vehicles, and taken to Senior's residence. Shortly thereafter, Senior was detained as he arrived at his residence. Senior made several statements claiming ownership of the marijuana. Senior refused, however, to give the officers permission to enter his residence. Senior was arrested after an officer inspected his chicken shed to confirm the marijuana sighting. The officers ultimately seized approximately one hundred marijuana plants from Senior's chicken shed.

Shortly thereafter, three officers drove to Junior's residence. One of the officers went to the northeast corner of the chain-link fence which surrounded Junior's house and observed marijuana growing both inside and outside the chain-link fence. The marijuana was contained in two gardens inside the valley on Junior's property and the gardens were each approximately fifty

1. The government does not dispute this finding.

to three hundred feet from Junior's house. The marijuana growing outside the chain-link fence was surrounded by the barbed wire fence. Throughout the entire area where the marijuana was found were chickens and chicken huts.

While at the northeast corner of the chain-link fence, an officer encountered Junior, who was coming out from the tree line. Junior made a statement to the effect, "it's my marijuana, just get the helicopter out of here because the roosters are worth more than the marijuana." Junior was then arrested, and he indicated that he would cooperate if the helicopter would leave. After the helicopter left, Junior gave the officers permission to search his house. Later, the officers seized approximately four hundred and sixty-eight marijuana plants from the two gardens.

On February 13, 1992, Senior and Junior were indicted for manufacturing marijuana, in violation of 21 U.S.C. § 841(a)(1), maintaining a place for the manufacture and distribution of marijuana, in violation of 21 U.S.C. § 856(a)(1), and managing and controlling buildings used for manufacturing, distributing, and storing marijuana, in violation of 21 U.S.C. § 856(a)(2). Defendants filed motions to suppress the marijuana, other seized evidence, and oral statements they made to arresting officers. After a two-day evidentiary hearing, the district court granted the motions.

The government frames two issues for review: (1) whether the district court erred in ruling that Senior's chicken shed and the area where marijuana was growing on Junior's property outside his chain-link fence, are, for purposes of the Fourth Amendment, within the curtilages of Senior's and Junior's respective homes,[2] and (2) whether, even if the areas are within the curtilages of Defendants' homes, the aerial observation of the marijuana did not violate the Fourth Amendment because the marijuana was first detected while the helicopter was positioned over the abandoned property outside the curtilages.

■ In reviewing an order granting a motion to suppress, we accept the trial court's factual findings unless clearly erroneous, *United States v. Waupekenay,* 973 F.2d 1533, 1535 (10th Cir.1992), and we view the evidence in the light most favorable to the district court's finding, *United States v. Preciado,* 966 F.2d 596, 597 (10th Cir.1992). Questions of law we review de novo. *Waupekenay,* 973 F.2d at 1535. As a threshold matter, we agree with the Third and the Eleventh Circuits that the issue of what comprises curtilage is a question of fact, *see United States v. Acosta,* 965 F.2d 1248, 1255 (3d Cir.1992); *United States v. Hatch,* 931 F.2d 1478, 1480 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 235, 116 L.Ed.2d 191 (1990), and therefore subject to the clearly erroneous standard of review. We reach this conclusion because the issue of whether an area is part of the curtilage of the home depends upon the factual resolution of whether "the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn,* 480 U.S. 294, 300–01, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987) (citations omitted). Further, to resolve curtilage questions, *Dunn* prescribes a four-factor test, *see infra,* which involves purely factual determinations. *See id.* at 301, 107 S.Ct. at 1139.

■ The Fourth Amendment protects the home and its curtilage from warrantless searches and seizures. *Id.* at 300, 107 S.Ct. at 1139. "[T]he extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* (citing *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984)). In *Dunn,* the Court held that the central component of this inquiry—"whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life"—is resolved with particular reference to four factors. *Id.* These factors are:

---

**2.** The government conceded below that the area inside Junior's chain-link fence was within the curtilage of Junior's house.

(1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.

*Id.* The government claims that the district court erred by mechanically applying these four factors and that *Dunn* commands a different result.

The defendant in *Dunn* owned a large tract of rural property completely encircled by a perimeter fence, with numerous interior barbed wire fences. *Id.*, 480 U.S. at 297, 107 S.Ct. at 1137. A fence encircled the residence and a greenhouse. *Id.* Approximately fifty yards from this fence were two barns, and the larger of the barns was enclosed by a wooden fence with an open overhang. *Id.* Locked, waist-high gates barred entry into the barn, and netting material stretched from the top of the wooden gates to the ceiling of the barn. *Id.*

In rejecting the defendant's Fourth Amendment challenge, the *Dunn* Court held that the barn was not within the curtilage of the home. *Dunn,* 480 U.S. 294, 107 S.Ct. 1134. The Court, applying the four-part test, first held that the distance between the barn and the home "supported no inference that the barn should be treated as an adjunct of the house." *Id.* at 302, 107 S.Ct. at 1140. Second, the Court found it significant that the barn did not lie within the fence that encircled the house. *Id.* Third, and "especially significant," the officers possessed objective data indicating that the barn was not being used for activities of the home; rather, the officers knew that a truck containing phenylacetic acid had unloaded its contents at the barn, that there was a loud running motor in the barn, and that a strong odor of phenylacetic acid was coming from the barn. *Id.* at 302–03, 107 S.Ct. at 1140–41. Fourth, observing that the numerous fences on the defendant's property served only to corral livestock and not to prevent people from seeing inside the enclosed area, the Court held that the defendant had done little to protect the barn area from observation. *Id.* at 303, 107 S.Ct. at 1140.

In determining whether Senior's chicken shed was within the curtilage of Senior's home, the district court applied the four *Dunn* factors. The court found that the shed was in close proximity to the house, that the chicken shed and house were enclosed by a barbed wire fence and natural surrounding of dense timber, that Senior maintained the area between his house and the chicken shed, and that Senior had done nothing to open for view his otherwise isolated house and chicken shed. Given these facts, the district court found that the chicken shed was within the curtilage of Senior's home.

While it is a close question, we cannot say that the district court's determination that the chicken shed was within the curtilage of Senior's home was clearly erroneous. First, we agree with the government that *Dunn* counsels against mechanical application of the four-factor test. *Id.* at 301, 107 S.Ct. at 1139 (four factors are useful only to extent they bear upon the central question of whether the area is so intimately tied to the home that it should be placed under the home's umbrella of Fourth Amendment protection). However, we are not persuaded that the district court necessarily ignored the central inquiry—whether the shed is intimately tied to Senior's home—in favor of perfunctory application of the *Dunn* factors. Unlike the situation in *Acosta,* where the Third Circuit determined that the *Dunn* factors were not as analytically useful in solving the curtilage question because the area in question was an apartment dwelling in an urban area, *Acosta,* 965 F.2d at 1255–56, the area at issue here is rural and remote from public view and is therefore similar to the area at issue in *Dunn.* Accordingly, the *Dunn* factors are particularly useful in deciding the curtilage question here, and the district court correctly applied the factors in addressing the central issue of whether Senior's chicken shed comes under the umbrella of his home for purposes of the Fourth Amendment.

First, the barn in *Dunn* was nearly twice the distance from the defendant's house as is Senior's chicken shed from his house. Second, the *Dunn* Court was particularly impressed that the fence encircling the defendant's house did not enclose the barn. Here, on the other hand, although the barbed wire fence around Senior's property was incomplete, the same fence encircled both Senior's house and his chicken shed, and no fence separated the two. Third, unlike in *Dunn*, the MERT officers possessed no objective data that Senior's chicken shed was not being used for intimate activities of the home. Rather, all the MERT officers knew before they spotted the marijuana was that the barn was partially roofed, old, and dilapidated. Further, the record reveals that Senior maintained a path between the shed and his house, that he considered the shed to be part of his yard, and that he used the chicken shed regularly. Finally, although Senior failed to repair the partially roofed shed, thereby opening the shed to view from overhead, this fact alone, in light of the other factors present, does not compel us to conclude that the district court's finding that Senior's chicken shed was within the curtilage of his home was clearly erroneous.

■ The district court also applied the *Dunn* factors to the area where marijuana was growing on Junior's property outside his chain-link fence ("the marijuana gardens") to determine whether the area was within the curtilage of Junior's house. In making this determination, the court relied on the following factors: (1) the marijuana gardens were in close proximity to Junior's house, (2) the gardens were enclosed by a barbed wire fence, (3) the marijuana was not visible from the public road or adjoining neighbors' property due to the contour of the land and the timberline, and (4) Junior had placed guard dogs on the perimeter of the area containing the marijuana gardens and there was no public access to this area other than through a locked gate. Given these facts, the district court concluded that the marijuana gardens were within the curtilage of Junior's house.

Upon review of the district court's order and the entire record, we are firmly convinced that the district erred in concluding that the marijuana gardens were within the curtilage of Junior's house. First, the gardens extended to a distance of approximately three hundred feet from Junior's house, and therefore, as in *Dunn*, "this substantial distance supports no inference that the [gardens] should be treated as an adjunct of the house." *Dunn*, 480 U.S. at 302, 107 S.Ct. at 1140. Second, although the gardens were encircled by a barbed wire fence, they were *outside* the fence that encircled Junior's house, and they were separated from Junior's house by the chain-link fence. Third, the area within the barbed wire fence contained numerous chickens and chicken huts and was used primarily for the raising of game chickens. These huts were visible to the MERT officers as they overflew the area, and indicated to them that the area was not being used for intimate activities of the home. Finally, Junior did little to protect the marijuana gardens from observation by those standing in open fields surrounding Junior's property. As in *Dunn*, the fence around the gardens was designed to corral the chickens, not to prevent others from seeing inside the fence. *See id.* at 303, 107 S.Ct. at 1140. Additionally, the guard dogs were used to keep wild animals away from the chickens, not to keep others from viewing the area. Further, that the marijuana gardens were not visible from the public road or adjoining neighbors' property, does not change our conclusion, for the barn at issue in *Dunn* was likewise not visible from the public road or from any neighbors' property. *Id.* at 306, 107 S.Ct. at 1142 (Brennan, J., dissenting). Because application of the four-factor *Dunn* test compels the conclusion that Junior's marijuana gardens were outside the curtilage of Junior's house, and because nothing else in the record can support a finding that the area was intimately tied to the activities of Junior's house, we conclude that the district court's finding that the marijuana gardens were within the curtilage of Junior's home was clearly erroneous. Because the marijuana gardens are thus "open fields," Jun-

ior had no legitimate expectation of privacy in the gardens, *see Oliver*, 466 U.S. at 179–84, 104 S.Ct. at 1741–44, and the MERT helicopter search of Junior's marijuana gardens was valid.

 The government's second argument is that, even if the areas searched are within the curtilages of Defendants' homes, the aerial observation of these areas did not violate the Fourth Amendment because the marijuana in these areas was first detected in plain view while the helicopter was positioned over the abandoned property outside the curtilages.[3] The position of the helicopter when it first spotted the marijuana is a fact-intensive inquiry that we would normally review for clear error; however, the district court made no fact findings with respect to the exact position of the helicopter upon first spotting the marijuana on Defendants' properties because the government did not raise this argument below.[4] Accordingly, because the government failed to raise the issue below, we deem the argument waived on appeal. *See Steagald v. United States*, 451 U.S. 204, 208–09, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981) (holding that government lost right to raise lack of expectation of privacy argument on appeal when it failed to raise argument below). We also decline to review for plain error because the issue is fact-intensive and "plain error review is not appropriate when the alleged error requires the resolution of factual disputes." *United States v.*

*Easter*, 981 F.2d 1549, 1556 (10th Cir.1992) (citing *United States v. Saucedo*, 950 F.2d 1508, 1518–19 (10th Cir.1991)).

The district court order granting Senior's motions to suppress is AFFIRMED. The portion of the district court's order granting Junior's motion to suppress marijuana due to an invalid warrantless search is REVERSED, and his case is REMANDED for further proceedings consistent with this opinion.

3. The government argued below that even if the marijuana was within the curtilages of Defendants' homes, the aerial observation of the marijuana nonetheless did not constitute a Fourth Amendment search under *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (holding that aerial observation of a greenhouse within the curtilage from a helicopter passing at an altitude of four hundred feet did not violate owner's reasonable expectation of privacy). Although the district court found the instant case distinguishable from *Riley*, we make no determination as to whether the MERT aerial observation is valid under *Riley*, because the government does not make this argument on appeal.

4. The only argument the government made below that is remotely similar to the argument here is that even if the marijuana was within the curtilages of Defendants' homes, because the marijuana was visible from open fields sur-

rounding the curtilages, the plain view doctrine applies. This argument totally misconstrues the plain view doctrine as it applies to searches. For the plain view doctrine to apply to searches, rendering the observation of evidence not a Fourth Amendment search at all, the officer must *actually view* the evidence in a place where the officer has a right to be. *See Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301, 2306, 110 L.Ed.2d 112 (1990); 1 Wayne R. La-Fave & Jerold H. Israel, *Criminal Procedure* § 3.2(b) (1984). In its argument to the district court, the government did not assert that an officer actually viewed the marijuana from an open field; rather, the government claimed that "*if* you were off the curtilage and in the open fields, you could still see the marijuana which was on the curtilage." Appellant's Trial Brief at 9 (emphasis added). The plain view doctrine was not intended to apply to hypothetical situations.