7 F.3d 1046
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jesus Jose UBANDA-HERNANDEZ, Defendant-Appellant.
 No. 92-2199.
 United States Court of Appeals, Tenth Circuit.
 Sept. 22, 1993.
 
 Before McKAY, Chief Judge, SETH and MOORE, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Appellant was convicted of conspiring to distribute more than 100 kilograms of marijuana, possessing that same marijuana with intent to distribute, and two counts of carrying and using a firearm during and in relation to a drug trafficking offense (one for each of the substantive drug counts). On appeal he claims that his arrest and the seizure of the marijuana were illegal. He also asserts that the evidence was insufficient to sustain his conviction on the gun charges.
 
 
 2
 The facts, viewed in the light most favorable to the government as required by United States v. Sanders, 928 F.2d 940, 944 (10th Cir.1991), indicate that in February of 1992, Border Patrol agents became aware that a group of individuals were crossing the border illegally near Sunland Park, New Mexico. Following tracks through the desert, agents became familiar with a particular bar sole footprint which they suspected belonged to the guide of the group. The agents also determined that the individuals were traveling to a particular residence located on the edge of the desert. Because of the difficulty the agents had in apprehending the individuals, the agents believed that the group was monitoring Border Patrol radio transmissions.
 
 
 3
 Shortly after midnight on March 2, 1992, two Border Patrol agents observed at least seven sets of footprints leading from the border into the United States in the desert near Sunland Park, New Mexico. The agents had passed the area without seeing the footprints two hours earlier, so they knew they were less than two hours old. They radioed their findings to other agents on a new frequency that they believed to be secure. These agents attempted to circle ahead of the group in an attempt to apprehend them. Agents observed two individuals near the residence the agents suspected as the group's destination. When the agents attempted to question these individuals, they dropped two bags and a cellular telephone and fled into the desert towards the border. The agents determined immediately that the bags contained marijuana. These agents subsequently backtracked the suspects' trail to the residence.
 
 
 4
 One of the agents who originally saw the tracks at the border followed them from that location to the same residence in Sunland Park. The house in question was surrounded by a cinder block wall. The footprints ended at the wall, indicating that the suspects went over the wall. At 3:30 a.m., nearly three hours after the original tracks were found, one of the agents looked over the wall, observed footprints in the yard, and decided to go over the wall to follow them further.
 
 
 5
 The prints went around several vehicles and ended at an old camping trailer parked in the back yard of the house. As he approached the trailer, the agent heard the sounds of the Border Patrol's radio communications coming from the trailer. He approached the trailer and knocked on the door, which swung open. Without entering the trailer, the agent observed Appellant and a woman inside, as well as what appeared to be several weapons. The agent also noted that one of the individuals was wearing the bar sole shoes agents had noted on prior occasions. The occupants of the trailer asked the agent what he wanted, to which he responded that he was looking for illegal aliens. He subsequently questioned the occupants about their immigration status, and when they admitted they were illegal aliens, he directed them to exit the trailer and placed them under arrest.
 
 
 6
 After they were outside the trailer, the agent noticed that Appellant glanced several times at a large tub which was five or six feet in front of the trailer. Fearing that someone might be hiding under the tub (which was large enough to conceal a person), he overturned it and discovered a duffel bag full of marijuana. He subsequently tracked other footprints to the location of a drop of four additional bags of marijuana. The total seizure from the seven bags was 553 pounds.
 
 I.
 
 7
 Appellant contends that government agents illegally entered into and searched the trailer he and a codefendant occupied. Appellant also apparently contends that the agents' entry into the yard in which the trailer was located was an illegal search because the yard constituted curtilage.[2] Appellant sought to suppress all of the evidence seized as fruit of the poisonous tree.
 
 A.
 
 8
 Appellant has provided this court with a very limited record on appeal,[3] and this record does not support Appellant's contentions. Contrary to Appellant's assertion regarding the agent's entry and search of the trailer, the record before us suggests no warrantless search took place and that the agent never entered into the trailer.[4] Rather, upon learning that the occupants were illegal aliens, he directed them to exit the trailer, and only then did he place them under arrest. Accordingly, Appellant's citation to case law prohibiting the warrantless arrest of an individual in a home is not pertinent. Accordingly, we hold that on the record before us Appellant's argument in this regard is without merit.
 
 B.
 
 9
 To the extent Appellant is arguing that government agents improperly entered into protected curtilage, we find that argument unavailing as well. Although Fourth Amendment limitations on warrantless searches and seizures have been extended to the curtilage, see Oliver v. United States, 466 U.S. 170, 180 (1984), the issue of what comprises curtilage is a question of fact which focuses on whether "the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." United States v. Swepston, 987 F.2d 1510, 1513 (10th Cir.1992) (quoting United States v. Dunn, 480 U.S. 294, 300-01 (1987).[5]
 
 
 10
 The record in this case contains no factual findings[6] relevant to the extent of any curtilage.[7] Because Appellant bore the burden of proving that a legitimate expectation of privacy was violated by the agents' entry onto alleged curtilage, see United States v. Rascon, 922 F.2d 584, 587 (10th Cir.1990), cert. denied, 111 S.Ct.2037 (1991); Fullbright v. United States, 392 F.2d 432, 435-36 (10th Cir.1968), Appellant's failure to request a finding on this critical point is fatal to Appellant's argument on this issue and precludes any appellate determination of whether the trial court's findings were clearly erroneous. Accordingly, under these circumstances we hold that Appellant's contentions in this regard are unavailing.
 
 II.
 
 11
 We turn now to Appellant's claim that the evidence was insufficient to convict him of carrying and using a firearm during and in relation to a drug trafficking offense, contrary to 18 U.S.C. 924(c) (1988). We will reverse only if we conclude after reviewing the evidence in the light most favorable to the government that no rational juror could find Appellant guilty beyond a reasonable doubt. United States v. Morehead, 959 F.2d 1489, 1499 (10th Cir.1992).
 
 
 12
 Under United States v. Parrish, 925 F.2d 1293, 1297-98 (10th Cir.1991), the government must establish that (a) the defendant had "ready access" to the firearm and (b) the firearm was an integral part of the crime and increased the likelihood that the crime would succeed. Here, there is no question that Appellant had access to the guns, so the only possible issue is the relationship of the firearms to the crime of drug smuggling.
 
 
 13
 In Parrish, we explained this issue as follows:
 
 
 14
 Firearms are used by narcotics dealers to protect themselves, their drugs, and their money. In this way guns facilitate the illegal drug activities. As the Eighth Circuit has pointed out, the "mere presence and ready availability at a house where drugs are dealt" is sufficient to establish use of a firearm under section 924(c). [ United States v. LaGuardia, 774 F.2d 317, 319 (8th Cir.1985) ]. The cases interpreting the requirements of section 924(c) evidence a presumption of a nexus between the firearm and offense when an individual with ready access to the firearm is involved in a drug trafficking offense. However, a defendant charged with a drug trafficking offense may overcome this presumption by presenting some evidence suggesting the firearm was present for a reason other than facilitating the drug operation.
 
 
 15
 Parrish, 925 F.2d at 1298 (citations omitted).
 
 
 16
 Under this standard, we see no basis for reversing this conviction. Appellant had easy access to the weapons while he was participating in a drug crime. The trailer appears to have played a central role in the drug conspiracy, since it was used to monitor law enforcement activities and since it was a hub of the various footprints. In addition, these weapons served to protect duffel bags full of marijuana located only a short distance away.
 
 
 17
 The judgment is AFFIRMED.
 
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [2]
 From the limited record before us, it is unclear whether Appellant raised the curtilage argument below. Likewise, Appellant's brief on appeal was primarily directed at the warrantless entry and arrest that he alleges occurred in the trailer. The word curtilage does not appear in Appellant's brief although it was discussed in the government's brief. At oral argument, the question of curtilage was a central theme
 
 
 [3]
 A hearing on Appellant's motion to suppress was conducted on May 18, 1992, before the trial court. The record on appeal reveals that a transcript of at least 118 pages resulted from this hearing. Excluding the trial court's factual findings and order, Appellant has provided this court with only eight pages of transcribed testimony
 
 
 [4]
 Although the agent observed firearms and a radio scanner, no search of the trailer was conducted until after a search warrant was obtained
 
 
 [5]
 In United States v. Dunn, 480 U.S. at 301, the Supreme Court articulated the following four-factor test for determining the extent of curtilage:
 (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by.
 Swepston, 987 F.2d at 1514.
 
 
 [6]
 After making specific findings of fact, the trial court asked Appellant if he desired any additional findings. Appellant did not request a finding on whether the yard in which the trailer was located was curtilage
 
 
 [7]
 Other than the description that the back yard of the house was enclosed by a cinder block wall, there is no testimony in the record before us relating Appellant's right to occupy the trailer, the extent of any claimed curtilage appurtenant to the trailer, the nature of any use of the property, and whether the trailer's occupant's had taken any steps to ensure their privacy