13 F.3d 407
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Troy BAILEY and George David Smith, Defendants-Appellants.
 Nos. 93-7007, 93-7009.
 United States Court of Appeals, Tenth Circuit.
 Dec. 17, 1993.
 
 Before ANDERSON, ENGEL,[2] and KELLY Circuit Judges.
 ORDER AND JUDGMENT[1]
 George David Smith and Robert Troy Bailey appeal their convictions on charges of possessing with intent to distribute, conspiring, and maintaining a place to manufacture marijuana, in violation of 21 U.S.C. 841(a)(1), 846, and 856(a)(1). Although their appeals are not consolidated, we join them in this disposition for convenience. Bailey challenges the sufficiency of the evidence and, in the alternative, seeks a new trial because of an alleged conflict of interest arising from his trial counsel's dual representation of him and Smith in their joint trial. Smith raises the same conflict of interest claim among other claims of ineffective assistance of counsel. Smith also challenges the district court's decision to replay a videotape to the jury during its deliberations. We reverse Bailey's conviction on all counts and Smith's conspiracy conviction. We affirm Smith's conviction on all other counts. We remand Smith's case for resentencing.
 BACKGROUND
 Viewing the evidence in the light most favorable to the government, as we must, Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Burney, 756 F.2d 787, 789 (10th Cir.1985), the salient facts are as follows. On August 15, 1992, Smith and Bailey were caught in a marijuana patch located about 200 yards from Smith's residence in rural Choctaw County, Oklahoma. As the two men inspected the plants, law enforcement agents surprised them and placed them under arrest.
 The agents were engaged in "Operation Red River," a joint effort by the Oklahoma Bureau of Narcotics (OBN), the United States Forest Service (USFS), and the Drug Enforcement Administration (DEA). The marijuana near Smith's home had been spotted by aircraft. On August 8, 1992, agents went to the patch and determined upon inspection that the plants were being cultivated, not growing wild. The plants were spaced evenly apart, and several large plants were reinforced with black electrical tape around the bottom. The agents installed a hidden video surveillance camera at the marijuana site. The camera was triggered by an infrared sensor, which detected movement in the immediate area, and would run for eight minutes before turning off automatically.
 On August 15, 1992, three agents returned to the site to check the camera and replace its tape. While there, they heard an approaching vehicle and, moments later, approaching voices. The agents hid and waited. Bailey's Appx. Vol. II-III, at 87, 196.
 Two agents testified at trial. They saw Smith and Bailey come into view and move around the marijuana patch inspecting plants, feeling them, smelling them, bending them over, and rubbing leaves between their fingers. Id. at 93, 202. The agents heard Smith make statements such as, "ought to get about twenty pounds from here," and "they're looking good over here, too," and "not any males in here either," and "I'm going to go over here and check on these smaller plants." Id. at 92-93, 199. Although the agents heard another voice, which they presumed to be Bailey's, they could not identify any of his statements. The videotape, which was introduced at trial, shows the codefendants engaged in the behavior described by the agents, but is silent as to any conversation.[3]
 Eventually, when Smith moved into an area where one of the agents was hiding, the agent announced, "Federal officer." Smith started to run, but was quickly apprehended. Id. at 95. Apparently, Bailey did not move and said nothing. Both men were arrested. After receiving Miranda warnings and without interrogation, Smith made several statements including, "Am I going to lose my place?" and "I am just trying to make a living. I am tired. I am glad it's over. I know what I have done is wrong." Id. at 97-98.
 Smith consented to a search of his house and surrounding property. In a small shed a short distance from Smith's house, agents found five marijuana plants being dried. Id. at 100-01. Also, Smith was carrying a pocketknife when he was arrested, and agents testified that the blade of the knife had green, leafy particles on it and appeared moist as if it had just cut something. Id. at 98-99. In the patch, agents found a plant still oozing from a fresh cut. Id. at 103.
 Smith and Bailey were jointly indicted on drug charges, Bailey on three counts, Smith on four.[4] They hired the same attorney, Warren Gotcher, to represent them from arraignment through their joint trial. At arraignment, the trial judge advised them of their right to separate counsel, but did not inquire whether their defenses or interests might potentially conflict. Bailey's Appx. Vol. II, Tab 17, at 5-7. Both men signed and filed forms purporting to waive their right to separate representation. Id. Vol. I, Tab 2; Appellee's Appx., at 1.
 The jury found Smith and Bailey guilty on all counts. At sentencing, the district court imposed terms of imprisonment on each defendant pursuant to the United States Sentencing Guidelines,[5] but ordered them released pending appeal finding that the dual representation of the codefendants at trial gave rise to a "substantial question" of law "likely to result in a reversal." 18 U.S.C. 3143(b)(1). Bailey's Appx. Vol. IV, at 34.
 After sentencing, Smith and Bailey obtained new and separate counsel. They separately filed post-judgment motions for acquittal and a new trial, raising all of the issues asserted on this appeal. The district court denied all post-judgment motions without comment.
 DISCUSSION
 I.
 Sufficiency of the Evidence Against Bailey
 Bailey contends that the evidence is insufficient to support his convictions. We agree.
 We must view all the evidence, direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the government, and we must sustain the jury's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Williams, 923 F.2d 1397, 1402 (10th Cir.1990) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)), cert. denied, 111 S.Ct.2033 (1991). "The evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt, although the evidence can be wholly circumstantial." Id.
 The basic element of a conspiracy is an agreement among the alleged coconspirators to violate the law. United States v. Mendoza-Salgado, 964 F.2d 993, 1004-05 (10th Cir.1992). The government must also show "that the defendant knew the essential objectives of the conspiracy, that the defendant knowingly and voluntarily took part in the conspiracy, and that the coconspirators were interdependent." United States v. Anderson, 981 F.2d 1560, 1563 (10th Cir.1992); United States v. Evans, 970 F.2d 663, 668 (10th Cir.1992), cert. denied, 113 S.Ct. 1288 (1993). We will not presume a defendant's involvement in a conspiracy, but we have consistently held that "the common plan or purpose may be inferred from a combination of circumstances," including the actions of the defendants. Mendoza-Salgado, 964 F.2d at 1005; United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.1988). The defendant's mere presence at the crime scene or association with co-defendants does not support a conspiracy conviction, Savaiano, 843 F.2d at 1294, just as "mere proximity to illegal drugs, mere presence on the property where they are located, or mere association with persons who do control them, without more, is insufficient to support a finding of possession." United States v. Espinosa, 771 F.2d 1382, 1392 (10th Cir.), cert. denied sub nom. 474 U.S. 1023 (1985). However, presence, proximity, and association are material and probative facts to be considered in conjunction with other evidence of guilt. Id. at 1393.
 Reviewing the record, there is a striking lack of evidence against Bailey as compared to Smith. The government focused almost all of its efforts on Smith. The patch was on Smith's property (or property owned by his mother that was under his control) and was about 200 yards from his house. While in the marijuana patch with Bailey on August 15, Smith talked about yield ("ought to get about twenty pounds from here"), plant quality ("they're looking good over here, too"), and plant gender ("not any males in here either"). After his arrest, he made statements tantamount to a confession, saying, "I am just trying to make a living. I am tired. I am glad it's over. I know what I've done is wrong." When searched incident to his arrest, Smith was found with a knife that appeared to have been recently used to cut a marijuana plant, and a freshly cut plant was found nearby. A shed on Smith's property contained five marijuana plants in the process of drying. Furthermore, according to the government, Smith was shown in the video tending to plants in the patch on August 10.
 In contrast to Smith, the evidence against Bailey consisted solely of his presence and conduct at the marijuana patch on August 15, as shown in the videotape and as described by the two law enforcement agents who testified. There was no other evidence of Bailey's activities, his connections, or any association with Smith or his enterprise, aside from the August 15 event. Bailey made no inculpatory statements and did not flee or otherwise resist arrest. If the government searched Bailey or his home, located some six miles from the crime scene, these searches turned up nothing that was entered into evidence. So rarely, in fact, was Bailey mentioned at trial that upon the defendants' motion for acquittal after the government rested, the district court remarked, "What about this guy Bailey? What evidence is there about Bailey?" Bailey's Appx. Vol. III, at 289.
 Even in closing argument, the government hardly mentioned Bailey, saying only that "the totality of the circumstances shows an implied agreement." Id. Vol. IV, at 377. And on appeal, we have simply seen more of the same from the government: no specific arguments about Bailey's knowledge, intent, or relationship with Smith; only repetitious, unenlightening assertions that a "conspiracy may be inferred from circumstantial evidence." Appellee's Brief, at 39.[6]
 Viewing the evidence--the videotape and agents' testimony about August 15--in the light most favorable to the verdict, we can reasonably infer the following about Bailey: He was in the middle of criminal activity and he knew it. He was casually and comfortably in the company of Smith in the presence of over 200 cultivated marijuana plants. Bailey was not "merely" present, either; he was actively examining marijuana plants both independently and with Smith. Moreover, Bailey's technique in examining the plants suggests at least some familiarity with marijuana cultivation.
 The fact that Smith trusted Bailey enough to bring him into the growing site and talk freely about production strongly suggests a preexisting or present relationship with respect to the possession and distribution of the drug. But, is that proof beyond a reasonable doubt of a conspiratorial agreement and relationship? Although it is admittedly a close call given our standard of review, we think not.
 Bailey relies appropriately on Anderson, 981 F.2d at 1565. In Anderson, we reviewed the evidence supporting defendant Anderson's involvement in a conspiracy and found it insufficient to support his conviction. Id. Police watched Anderson leave a house (the "Grogan residence") with a white bowl filled with marijuana and deliver this bowl to someone else. Id. at 1562. After he was arrested, police searched the Grogan residence and found marijuana in almost every room, totalling nearly 2,000 pounds. Id. at 1563. Police also found in the house pictures of Anderson, which were introduced to prove his relationship with the other people charged a conspiracy to distribute the marijuana. Id. In addition, one of the men seen leaving the Grogan residence earlier that day had a message left for him at his hotel to "call James," which was Anderson's first name. Id.
 We reversed Anderson's conspiracy conviction because we feared that "he may well have been convicted of conspiracy because of his misfortune to conduct a one-time transaction at the Grogan residence on this particular day," id. at 1564, and that his conviction required a piling of "inference on inference." Id.; see also Evans, 970 F.2d at 671. The evidence, we held, did not establish that Anderson knew the scope of the conspiracy or that he knowingly and voluntarily became a part of it. Anderson, 981 F.2d at 1564. Comparing the evidence against Bailey to the evidence against Anderson, we think it would be inconsistent with our result in Anderson to find the evidence against Bailey sufficient.[7]
 We noted in Anderson that "the absence of [more proof] was most likely due to the agents serendipitously arriving in the neighborhood of the Grogan residence and the rapidity with which the activities unfolded." Id. The same stroke of luck, good or bad, befell the government in this case. They went to Smith's property on August 15 to replace the videotape in the surveillance camera, not to make arrests. It was only because Smith and Bailey entered the patch during the agents' visit that arrests were made on that day. As a result, however, "[n]o informant, undercover agent, or coconspirator testified regarding [Bailey's] involvement in the conspiracy." See id. Such "inside knowledge," while not required in every case, certainly helps "solidif[y] the evidence against each particular defendant who is charged, reinforcing the principle that guilt remains individual and personal.' " Id. (quoting United States v. Kotteakos, 328 U.S. 750, 772 (1946)).
 We are mindful that the evidence against Bailey "need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." United States v. Richard, 969 F.2d 849, 856 (10th Cir.) (quoting United States v. Henry, 468 F.2d 892, 894 (10th Cir.1972)), cert. denied, 113 S.Ct. 248 (1992). Here, however, as in Anderson, there is a failure of evidence on the record before us from which a jury could find beyond a reasonable doubt that Bailey was part of a conspiracy to grow and distribute this marijuana with Smith. We therefore reverse his conspiracy conviction.
 Next, we consider whether there was sufficient proof independent of a conspiracy to support Bailey's remaining convictions for possession with intent to distribute and maintaining a place to manufacture marijuana.[8] The government has not argued on appeal that either of these convictions can stand against Bailey absent a conspiracy. It avoided this argument at trial, as well. We infer from the government's silence that its theory of liability with respect to Bailey requires his membership with Smith in a conspiracy, which we have rejected. We therefore hold that no jury could find beyond a reasonable doubt that Bailey's presence and actions on August 15 in the patch located on Smith's property made him guilty of "possessing" the marijuana or "maintaining" the drying shed. See Anderson, 981 F.2d at 1565. We therefore reverse Bailey's remaining convictions, and we need not address his alternative arguments.
 II.
 Smith's Conspiracy Conviction
 Smith and Bailey were the only coconspirators named in the indictment, although it also alleged other "unknown" coconspirators. Because we have reversed Bailey's conspiracy conviction, we must also reverse Smith's unless the government proved beyond a reasonable doubt the existence of one or more "unknown" coconspirators. United States v. Howard, 966 F.2d 1362, 1364 (10th Cir.1992); United States v. Levario, 877 F.2d 1483, 1486 (10th Cir.1989). The government has not made such a showing. Furthermore, we are unable to infer from circumstantial evidence in the record that other coconspirators had to exist. Cf. Howard, 966 F.2d at 1364 (circumstantial evidence of an "unknown" coconspirator was sufficient) Thus, we reverse Smith's conspiracy conviction.
 III.
 Smith's Sixth Amendment Claims
 Smith contends that he was denied his Sixth Amendment right to effective representation and seeks a new trial on this ground. Smith claims (1) that his trial counsel was constitutionally ineffective in failing to pursue certain defenses, and (2) that his trial counsel was operating under an actual conflict of interest. Although it is generally better to bring ineffective assistance claims in a 28 U.S.C. 2255 proceeding, where an evidentiary hearing on the specific allegations can be held, see Beaulieu v. United States, 930 U.S. 805, 806-07 (10th Cir.1991), the parties insist and we agree that the record as it stands is sufficient for us to resolve Smith's claims.
 A. Allegations of Attorney Error
 In order to establish ineffective assistance of counsel, Smith must show (1) that his counsel's performance was deficient in light of prevailing professional norms and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). In evaluating counsel's performance there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. In order to establish prejudice a defendant must generally show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; cf. Lockhart v. Fretwell, 113 S.Ct. 838, 842-43 (1993) (emphasizing that prejudice also requires that errors produced an unfair or unreliable trial). We review de novo whether counsel's performance was legally deficient and whether any deficiencies prejudiced Smith. See United States v. Whalen, 976 F.2d 1346, 1347 (10th Cir.1992); United States v. Miller, 907 F.2d 994, 997 (10th Cir.1990).
 Smith alleges that his trial counsel, Gotcher, was deficient in failing to: (1) investigate and assert as a defense that the person shown in the videotape tending the marijuana patch on August 10 was actually Smith's younger brother, Barry; (2) call a witness to rebut Smith's incriminating statements after he was arrested; and (3) move to suppress the videotape on grounds of the Fourth Amendment or the Omnimbus Crime Control and Safe Streets Act of 1968.
 We go directly to the prejudice requirement on Smith's first two claims, see Strickland, 466 U.S. at 697, and hold that he cannot show prejudice as a result of these alleged deficiencies. The strong case presented against Smith did not turn on any single piece of evidence. Even if we assume without deciding that Gotcher could and should have (1) proven that the person videotaped on August 10 was Smith's younger brother, Barry, and (2) impeached the agents' testimony about Smith's post-arrest "confession" by calling another agent who was present at the time of arrest but who did not testify, the following evidence would have still pointed to Smith's guilt: His presence in the patch on August 15; the videotape showing his actions on August 15; the agents' observations of him moving around the patch carefully tending the plants; his statements to Bailey about production ("ought to get twenty pounds out of here"), quality ("they're looking good over here, too"), and gender ("not any males in here either"); evidence that the marijuana was clearly being cultivated; the location of the patch on Smith's property near his home; the marijuana found in the drying shed; and the knife found on Smith at the time of his arrest. In light of this evidence of Smith's guilt, our confidence in the outcome is not undermined as a result of these two alleged deficiencies.
 Smith's third claim of ineffectiveness, that his counsel failed to exclude the videotape, lacks merit because it alleges no error. Smith's open-field marijuana patch was not protected from silent video surveillance either by the Fourth Amendment, Oliver v. United States, 466 U.S. 170, 180-81 (1984),[9] or the Omnibus Crime Control and Safe Streets Act of 1968. United States v. Koyomejian, 970 F.2d 536, 540-41 (9th Cir.) (en banc) (Title I does not apply to silent domestic video surveillance), cert. denied, 113 S.Ct. 617 (1992); United States v. Mesa-Rincon, 911 F.2d 1433, 1437 (10th Cir.1990) (Title III does not apply).
 B. Conflict of Interest
 Smith also contends that Gotcher's representation of him was adversely affected by a conflict of interest. The right to counsel guaranteed by the Sixth Amendment includes the "right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). If a defendant can show both an actual conflict and an adverse effect, no further showing of prejudice is necessary. Strickland, 466 U.S. at 692; Cuyler, 446 U.S. at 349-50; United States v. Bowie, 892 F.2d 1494, 1500 (10th Cir.1990).
 As we have noted, "[a]ctual conflict' and adverse effect' are not self-defining phrases." Bowie, at 1500 (quoting Cuyler, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part). Several circuits hold that, in order to prove an "adverse effect" under the Cuyler test,
 
 
 1
 [a defendant first] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.
 
 
 2
 Winkler v. Keane, No. 93-2164, 1993 U.S.App. LEXIS 26842, at * 14-15 (2d Cir. Oct. 13, 1993) (emphasis added) (quoting United States v. Fahey, 769 F.2d 829, 836 (1st Cir.1985)); United States v. Gambino, 864 F.2d 1064, 1071 (3d Cir.1988), cert. denied, 492 U.S. 906 (1989). Though we did not attempt to define "adverse effect" for all contexts, we applied a similar test in Bowie. See Bowie, 892 F.2d at 1500.
 
 
 3
 The burden is on Smith to point to specific instances where an actual conflict adversely affected his representation. See Cuyler, 446 U.S. at 350 (possibility of conflict is insufficient); United States v. Martin, 965 F.2d 839, 842 (10th Cir.1992) (per curiam). To this end, Smith identifies several instances that he claims meet this standard. We disagree.
 
 
 4
 First, he claims that Gotcher actively represented a conflicting interest in advising Bailey not to testify. While technically true perhaps,[10] Smith is not entitled to relief because, even with separate counsel, Smith would not have been able to control Bailey's decision to testify.[11] See Martinez v. Sullivan, 881 F.2d 921, 930-31 (10th Cir.1989) (A defendant is entitled to invoke his right not to testify, and once he has done so there is no way to require him to testify, separate counsel or not), cert. denied sub nom. 493 U.S. 1029 (1990). Therefore, the joint representation had no cognizable adverse effect on Smith. That separate counsel could have "pressed" Bailey to testify, as Smith claims, is not a tactic of sufficient substance to render its unavailability an "adverse effect."
 
 
 5
 Smith claims that Gotcher was precluded by the joint representation from several other trial tactics. Specifically, he claims that Gotcher could not (1) argue a lack of evidence against Smith because it would risk emphasizing the weight of evidence against Bailey, (2) could not commend Smith for testifying because it would highlight Bailey's failure to testify, and (3) could not submit to the jury an instruction about Bailey's right not to testify because it would further discredit Bailey for not testifying. These claims are meritless as well.
 
 
 6
 The first argument would have been implausible for Smith because it belies the evidence presented at trial. See supra part I. Bailey, with separate counsel, may have benefitted from an argument comparing the weight of evidence against the two defendants, but Smith had no such argument available in his defense.
 
 
 7
 Similarly, given Smith's testimony that he and Bailey were equally and wholly innocent, it would have been implausible and against Smith's interest for his counsel, even if separate, to risk discrediting Smith's defense by calling attention to Bailey's silence, either during closing argument or in a jury instruction. Thus, Smith's second and third arguments are tactics that were foreclosed by his "united front" defense, not by any conflict of interest. Smith has not alleged that the "united front" defense, itself, which was based on his own sworn testimony, was an adverse product of the joint representation. To the contrary, he has maintained this defense through this appeal. Appendix to Smith's Opening Brief, at 89.
 
 
 8
 Because we have found no infringement on Smith's Sixth Amendment rights, we need not consider whether he knowingly and intelligently waived those rights by filing the waiver of separate representation form.
 
 IV.
 Replaying the Video to the Jury
 
 9
 Smith also contends that the district court erred in allowing the jury to watch the videotape again during deliberations. This is a matter resting in the sound discretion of the trial court, United States v. Thomas, 945 F.2d 328, 330 (10th Cir.), cert. denied, 112 S.Ct. 404 (1991), and we find no abuse of discretion here.
 
 
 10
 While we have recognized that rereading of witness testimony to the jury during deliberations is "disfavored" because of the potential that the jury might "unduly emphasize" that evidence, see United States v. Keys, 899 F.2d 983, 988 (10th Cir.), cert. denied, 498 U.S. 858 (1990), we have upheld this practice where the witnesses' testimony was read in its entirety, where it was read only after the trial court instructed the jury to try to use their collective memories first, and where the court then determined that reading the testimony was "absolutely essential" for a verdict. Id.
 
 
 11
 This case presented a similar situation, although involving a videotape of alleged criminal activity rather than taped or transcribed trial testimony. The trial judge denied the jury's initial request to review the video, explaining to jurors that "it would not be appropriate to play the video again, as it would not be appropriate to ... have [the court reporter] read one of the witnesses again.... Rather than emphasize any particular piece of evidence ... I'm going to send you back to ... continue your deliberations." Bailey's Appx. Vol. IV, at 408. Four hours later, the deadlocked jury again requested a replay, and the foreman wrote a note to the judge saying that "we feel the only evidence that is capable of persuading a change of the vote will be our viewing the videotape." Id. at 412. After discussing the matter at length with counsel for the government and defense, the trial judge decided to grant the jury's request, over defense counsel's objection. We find no abuse in the trial judge's careful and reasonable exercise of its discretion.
 
 
 12
 Smith relies on United States v. Binder, 769 F.2d 595 (9th Cir.1985), in which the Ninth Circuit found abuse in the district court's decision to replay videotaped testimony of a child abuse victim. Id. at 601. Binder is distinguishable, however, in several respects. First, in Binder there was no evidence of the defendant's guilt other than the videotaped testimony. Id. Here, there was ample evidence of Smith's guilt aside from the videotape. Second, the trial judge in Binder replayed only portions of the testimony that was admitted at trial. Id. Here, there was no such selective editing; the videotape was replayed in its entirety. Third, the content of the videotape in Binder was witness testimony and credibility of that witness was the central issue, which was not the case here.
 
 CONCLUSION
 
 13
 For the reasons stated above, we REVERSE Bailey's conviction on all counts, and Smith's conviction on the conspiracy charge. Smith's conviction on the three remaining counts is AFFIRMED. Smith was originally sentenced to four concurrent terms of 70 months imprisonment, which was at the midpoint of the applicable guideline range of 63 to 78 months (based on a base offense level of 26 and a criminal history of I). Although it is unlikely that the reversal of one of four counts underlying his present concurrent sentences will alter Smith's sentence, the possibility exists that the district court could sentence at a lower point within the guideline range. Accordingly, we REMAND for resentencing.
 
 
 
 [2]
 The Honorable Albert J. Engel, Senior Circuit Judge, United States Court of Appeals, Sixth Circuit, sitting by designation
 
 
 [1]
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [3]
 The camera also triggered on August 10, 1992, and recorded a partially masked individual, who the government claims is Smith, similarly inspecting and removing plants from the patch. Smith denies that he is the person in the video on August 10. He claims it was his younger brother, Barry. This factual contention is related to one of his ineffective assistance of counsel claims, discussed below
 
 
 [4]
 Smith and Bailey were both charged with conspiracy to manufacture and possess with intent to distribute marijuana, in violation of 21 U.S.C. 846, possession of 217 marijuana plants with intent to distribute, in violation of 841(a)(1), and maintaining the "drying shed" on Smith's property as "a place for the purpose of ... storing ... marijuana," in violation of 856(a)(1). Smith was charged, alone, with an additional violation of 856(a)(1) pertaining to his residence
 
 
 [5]
 Smith was sentenced to concurrent 70-month terms of imprisonment, plus concurrent four-year terms of supervised release, on each count. Bailey was sentenced to concurrent 87-month terms of imprisonment, plus concurrent four-year terms of supervised release, on each count. Neither defendant disputes the accuracy of their sentence under the guidelines
 
 
 [6]
 The government filed a single, consolidated brief in response to the separately briefed and argued appeals by Smith and Bailey
 
 
 [7]
 The government compares the present case to United States v. Coslet, 987 F.2d 1493 (10th Cir.1993), in which a defendant, carrying various tools of cultivation as well as small amounts of marijuana, was arrested while standing in a marijuana patch. The defendant said he was looking for deer. We found the evidence sufficient to affirm his conviction for possession with intent to distribute the marijuana growing in the patch, even though he did not own the land. Id. at 1495. No conspiracy was charged in Coslet, however, and thus it sheds no light on the kind and quantum of evidence from which an illicit agreement can be inferred
 
 
 [8]
 To sustain these convictions, we must find, respectively, that Bailey knowingly possessed the marijuana in the patch on Smith's property with intent to distribute it, United States v. Parra, 2 F.3d 1058, 1069 (10th Cir.1993), and that he knowingly maintained the patch for the purpose of manufacturing its crop. Williams, 923 F.2d at 1403
 
 
 [9]
 Smith does not contend that the marijuana patches were within the curtilage of his home. See United States v. Swepston, 987 F.2d 1510, 1513-14 (10th Cir.1993) (discussing factors relevant to curtilage vs. open field inquiry). Smith's contention that he had an expectation of privacy in the fields surrounding his residence and curtilage because he ran cattle on those fields is meritless
 
 
 [10]
 Smith testified and explained that he and Bailey were searching for a "lost goat," stumbled unknowingly into the marijuana patch, and were wholly innocent of wrongdoing. He claims that his interests would have been best served by having Bailey testify also (provided, of course, that Bailey told the same "lost goat" story). Bailey, however, followed Gotcher's advice and remained silent
 
 
 [11]
 We can safely assume that separate counsel for Bailey would have advised him not to testify just as Gotcher did, in anticipation of the result we reached in part I, supra