**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

KURT DONALD COUSINS, and
BUKOLA TOLASE-COUSINS,

       Defendants - Appellants.

Nos. 04-2218 & 04-2264

**ORDER**

Filed July 26, 2006

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HENRY**, Circuit Judge.

Ms. Bukola Tolase-Cousins filed a petition for rehearing by the panel with a suggestion for consideration by the *en banc* court. We grant the petition for panel rehearing in part for the limited purpose of revising our discussion of the standard of review for curtilage determinations. In all other respects, Ms. Tolase-Cousins's petition for rehearing is denied. The court's opinion filed on March 17, 2006 is withdrawn, and a copy of the amended opinion is attached to this order. The mandate issued in appeal number 04-2264, is hereby recalled.

In light of the en banc request, the petition for rehearing was transmitted to all of the judges of the court who are in regular active service. As no judge in

regular active service requested that the court be polled on the petition, the request for en banc review is denied.

Entered for the Court
Elisabeth A. Shumaker, Clerk of Court


By:
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

KURT DONALD COUSINS, and
BUKOLA TOLASE-COUSINS,

       Defendants - Appellants.

Nos. 04-2218 & 04-2264

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-03-1451 BB)**

Hope Eckert, Attorney at Law, LLC, Albuquerque, New Mexico (Michael A. Keefe, Assistant Federal Public Defender, Albuquerque, New Mexico, with her on the briefs) for Defendants-Appellants.

David N. Williams, Assistant United States Attorney, Albuquerque, New Mexico (David C. Iglesias, United States Attorney for the District of New Mexico, with him on the brief) for Plaintiff-Appellee.

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **HENRY**, Circuit Judge.

**EBEL**, Circuit Judge.

Kurt Cousins and Bukola Cousins pled guilty to various drug charges stemming from the discovery of over 500 marijuana plants growing in their backyard. Police officers, acting on a tip from a utility employee, entered into a "sideyard" of Defendants' house and, looking through a hole in a fence, were able to observe marijuana plants growing in Defendants' backyard. Below and on appeal, Defendants argue that the police conduct violated the Fourth Amendment because the sideyard was within the curtilage of their house. We conclude that the district court properly rejected this claim and therefore AFFIRM the district court's denial of the motion to suppress.

Defendant Kurt Cousins also challenges the validity of his sentence. Specifically, Kurt Cousins argues that the district court should not have used a 1996 state court conviction in calculating his criminal history category because that conviction was obtained without the benefit of counsel and in violation of the Sixth Amendment. We conclude that Kurt Cousins's 1996 conviction was unconstitutional at the time it was imposed and REVERSE his sentence and REMAND for resentencing.

## BACKGROUND

### I. Factual background

On June 12, 2003, Robert Bryant, an employee with Public Service of New Mexico ("PNM"), visited the home of Kurt Donald Cousins ("Kurt") and Bukola Tolase-Cousins ("Bukola") (collectively "Defendants"), a married couple. Bryant

was attempting to collect on a delinquent bill for electricity and gas services. When he knocked on the door, there was no answer. After leaving a note stating that the home's power would be cut off, Bryant then went to the electricity meter and cut the power to the house using two plastic "boots." The meter was located on the east side of a small "sideyard," directly adjacent to the Cousinses' home.

The sideyard was approximately eight feet wide and was bordered to the north by a gate leading to the Cousinses' backyard, to the west by a fence separating the Cousinses' property from their neighbor's, and to the east by the Cousinses' residence. There was no barrier to the south. One could enter the sideyard from the south by walking north along the Cousinses' driveway and following a paved walkway that led west (away from the front door) and turned north at the edge of the Cousinses' garage where it ended in front of the gate. The distance from the electric meter to the gate was approximately thirteen feet. Defendants had planted a small melon garden in the sideyard to the left of the paved walkway.

Bryant returned on July 2, 2003, because payment on the utility bill still had not been made. He discovered that the electric meter had been tampered with: the boots had been removed and the meter had been reinstalled. Bryant disconnected the power and placed a new lock on the electric meter and also disconnected the gas service to the house.

The following afternoon, Bryant again returned to Defendants' residence and discovered that someone had attached jumper cables to the meter in order to provide electricity illegally to the house. Bryant then called PNM and requested a "trouble truck" be sent to the address so that electricity could be cut at the transformer, which would prevent theft of electricity from the meter. As he was waiting for the truck to arrive, Bryant leaned against the west wall of the sideyard, where he was able to see into the backyard of the house through an open gate.[1] As he was looking through the gate, Bryant saw what he recognized to be marijuana plants growing in Defendants' backyard.

After the trouble truck came and completed the process of cutting off electricity at the transformer, Bryant left the premises. After driving about half a block, Bryant saw a police car pulling out in front of him from a nearby side street. Bryant got out of his car and flagged down Officer Mark Manno of the Rio Rancho Department of Public Safety. Bryant identified himself as a PNM employee and told Manno he had seen marijuana growing in the backyard at the Cousinses' residence. Officer Manno then put in a call for backup, to which Officers Sal Gonzalez, Tim Robey, and Robert Kinney responded. After Bryant left, the four officers drove to the area in which Defendants lived, parked several

---

[1]At the suppression hearing, Bryant stated that he was "positive" that the gate was open when he saw the marijuana plants in the back yard. However, when police officers arrived at the scene, the gate was closed.

houses away, and approached the Cousinses' residence on foot. All four officers walked up Defendants' driveway, turned west (away from the front door), and walked north into the sideyard where the electric meter was located. Although the open gate Bryant had spoken of earlier was now closed, Gonzalez noticed that the door of the gate had three heart-shaped cutouts through which one could see into the backyard. All four officers looked through the holes in the gate and agreed that there was, in fact, marijuana growing in the backyard. Gonzales also detected the faint smell of marijuana in the area. After a few minutes, the four officers then "backed away," so that they could form a plan of action.

Officer Gonzalez contacted Officer French, a local patrol officer who was also assigned to the local Drug Enforcement Agency ("DEA") task force. Officer French advised that he would be there shortly and instructed Gonzalez to establish a security perimeter around the house and to detain anyone coming in or out. Before the officers established the perimeter, they saw a woman (later identified to be Defendant Bukola Cousins) drive up to the residence in a white car. Officer Gonzalez approached Bukola and asked her if she was a resident of the house, to which she answered "yes." Bukola refused to identify herself, saying only that she was a "secured party." Officer Gonzalez handcuffed Bukola and placed her in his police car. Gonzalez then ordered the other three officers to establish a security perimeter around the house due to concerns about officer safety. Officer

Robey secured the rear of the house from the backyard while Officer Manno secured the front entrance.

A short time thereafter, Officer French arrived with Detective Jeremy Melton. French and Melton took control of the investigation and interviewed the other officers as well as Bukola. Melton prepared an affidavit for a search warrant seeking authority to search Defendants' home. A New Mexico state district court judge issued the warrant, and later that evening, officers executed a search of the premises. They discovered Defendant Kurt Cousins as well as 505 marijuana plants of various sizes in the backyard.

## II.    Procedural history

On August 1, 2003, a federal grand jury returned a three-count indictment against Defendants. Count I accused Defendants of conspiring to manufacture more than 100 marijuana plants, in violation of 21 U.S.C. § 846. Count II accused Defendants of maintaining a place to manufacture and distribute marijuana, in violation of 21 U.S.C. § 856(a)(1) and (b). Count III sought the criminal forfeiture of Defendants' residence in the event they were convicted of either crime alleged in the previous counts, pursuant to 21 U.S.C. § 853.

On January 30, 2004, Defendants filed a joint motion to suppress all evidence discovered at their residence when officers executed the search warrant. They had two primary arguments: First, Defendants claimed that officers violated the Fourth Amendment by entering upon the curtilage of their house without a

warrant.  Second, they claimed the affidavit in support of the warrant contained false statements which rendered the warrant invalid under Franks v. Delaware, 438 U.S. 154 (1978).

The district court denied the motions to suppress as well as a subsequent motion to reconsider.  Subsequently, pursuant to a plea agreement, Bukola agreed to plead guilty to Count II (maintaining a place to manufacture marijuana) of the indictment while reserving the right to appeal the district court's suppression ruling.  The Government, in turn, agreed to dismiss Count I.  The district court accepted the plea and sentenced Bukola to five months' imprisonment and three years' supervised release, in accordance with the recommendations made in her presentence report ("PSR").

Kurt Cousins also entered into a plea agreement whereby he agreed to plead guilty to Count I of the indictment (conspiracy) in exchange for the Government's agreement to drop Count II.[2]  The probation office then prepared a PSR and recommended a level II criminal history category for Kurt and an offense level of 18.  Based on these recommendations, Kurt would have been eligible under the sentencing guidelines for a sentence of between 30 and 37 months.  However, the crime for which Kurt was convicted carried a five-year mandatory minimum sentence.  See 21 U.S.C. § 841(b)(1)(B).  The only way around this mandatory

---

[2]As part of their plea agreements, both Defendants agreed to forfeit their property as outlined in Count III of the indictment.

minimum sentence was to qualify for a safety valve reduction, see 18 U.S.C.

§ 3553(f), which requires, among other things, a level I criminal history category.

Therefore, at sentencing, Kurt objected to the PSR's criminal history recommendation. He argued that one of the two criminal history points accorded to him was due to a 1996 South Carolina misdemeanor conviction during which Kurt alleges he was deprived the right to counsel. Without this criminal history point, Kurt would have been eligible for the safety valve reduction and therefore for the lower sentencing guidelines range. After holding a hearing, the district court overruled Kurt's objection, adopted the findings of the PSR, and sentenced Kurt to the statutory mandatory minimum, five years' imprisonment.

Kurt and Bukola each filed appeals regarding the district court's denial of their motion to suppress.[3] In addition, Kurt filed an appeal challenging the legality of his sentence. Kurt's and Bukola's appeals have been consolidated before this panel.

## DISCUSSION

### I. Motion to suppress

When reviewing a district court's ruling on a suppression motion, "we accept the district court's factual findings absent clear error and review de novo

---

[3]As noted above, the original suppression motion argued both that the officers invaded the house's protected curtilage and the accuracy of statements in the warrant affidavit. However, on appeal, Defendants only challenge the curtilage aspect of the district court's decision denying the motion to suppress.

the district court's determination of reasonableness under the Fourth Amendment." United States v. Olguin-Rivera, 168 F.3d 1203, 1204 (10th Cir. 1999). In the past, we have reviewed district courts' curtilage determinations for clear error. See, e.g., United States v. Swepston, 987 F.2d 1510, 1513 (10th Cir. 1993). However, based on the Supreme Court decision in Ornelas v. United States, 517 U.S. 690 (1996), we now conclude that ultimate curtilage conclusions are to be reviewed under a *de novo* standard although we continue to review findings of historical facts for clear error.[4] Accord Ornelas, 517 U.S. at 691; United States v. Barajas-Avalos, 377 F.3d 1040, 1054 (9th Cir. 2004) (citing United States v. Johnson, 256 F.3d 895, 912 (9th Cir. 2001) (en banc)), cert. denied, 543 U.S. 1188 (2005); United States v. Breza, 308 F.3d 430 (4th Cir. 2002); United States v. Diehl, 276 F.3d 32 (1st Cir. 2002).

## A.    Applicable law

"The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of

---

[4]We have circulated this portion of our opinion to the *en banc* court, which has unanimously agreed that the ultimate curtilage determination is a legal question to be reviewed *de novo* and that findings of historic facts are reviewed for clear error. To the extent that any holdings in our prior cases are to the contrary, such holdings are therefore overruled. See, e.g., United States v. Long, 176 F.3d 1304, 1308 (10th Cir. 1999) (stating, post-Ornelas, that "[t]he district court's factual determination that the bags were located outside the curtilage is subject to a clearly erroneous standard of review"); United States v. Knapp, 1 F.3d 1026, 1029 (10th Cir. 1993); United States v. Swepston, 987 F.2d 1510, 1513 (10th Cir. 1993).

burglary as was afforded the house itself." United States v. Dunn, 480 U.S. 294, 300 (1987). In Oliver v. United States, 466 U.S. 170 (1984), the Supreme Court recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question will remain private. Id. at 180. The central component of this inquiry is whether the area harbors the "intimate activity associated with the sanctity of a man's home and the privacies of life." Id. (quotation omitted). In Dunn, the Court more carefully defined this standard and articulated four factors used to determine whether a particular area was within the curtilage of a house: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation. 480 U.S. at 301. These factors are not a "finely tuned formula," but "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. at 301.

**B.    Analysis**

Applying the four Dunn factors, we conclude that the district court did not clearly err in finding that the sideyard area was not within the curtilage of the Cousinses' home.

### 1. Proximity of area to house

The sideyard was immediately adjacent to the house. Thus, the proximity factor suggests this area is curtilage.

### 2. Enclosure

The sideyard was enclosed on three sides: (1) on the east by an exterior wall of the house; (2) on the north by the gate door; and (3) on the west by a fence. As such, the sideyard is partially, though not completely, enclosed.

Courts have found an area to be curtilage where the area in question is only partially enclosed. See, e.g., Swepston, 987 F.2d at 1515 ("Here . . . although the barbed wire fence around [Defendant's] property was incomplete, the same fence encircled both [Defendant's] house and his chicken shed, and no fence separated the two."). In United States v. Jenkins, 124 F.3d 768 (6th Cir. 1997), the Sixth Circuit found an area to be curtilage where the yard was

> enclosed on three sides by a wire fence, making it impossible for someone to enter the yard from the fields without using the gate or climbing over the fence. Entry from the remaining side, although not completely barred, [was] partially obstructed by the house.

Id. at 773. What makes the instant case different from Jenkins is that the unenclosed side is the expected path one would take to get to the sideyard, and it is a paved sidewalk. Given this, it is substantially different from the areas in question in either Jenkins or Swepston. Thus, this factor weighs against a finding of curtilage.

### 3.    Nature of the use of the area

There is some evidence in the record that a portion of the sideyard area was used as a garden for melons. Gardening is an activity often associated with the curtilage of a home. See United States v. Breza, 308 F.3d 430, 436 (4th Cir. 2002). This is not to say that simply because an area has a garden, it will always be within the curtilage. As Dunn makes clear, the area in question must be used for the "intimate activities of the home." 480 U.S. at 302. Whatever intimate character a few melon plants might add to the sideyard, we cannot conclude that gardening was a primary or even significant use of this area. Indeed, the presence of the electric meter and paved walkway belie any claim that the sideyard was intended as a private space for gardening. Thus, this factor also weighs against a finding of curtilage.

### 4.    Shielding from public view

As for the fourth Dunn factor, the district court concluded that "no steps were taken by Defendants to limit access to this walkway even when they were clearly aware utility employees frequented this area." Defendants' main counter-argument is that a number of trees and bushes restricted the view of the sideyard from the street. Even if this is true, it is still clear that the utility meter and gate were visible from the street and that the sideyard was connected to the driveway by a paved walkway that was accessible to any and all persons wishing to enter upon it. See LaFave, supra, at 599-603 ("In the course of urban life, we have

- 12 -

come to expect various members of the public to enter upon such a driveway, e.g., brush salesmen, newspaper boys, postmen, Girl Scout cookie sellers, distressed motorists, neighbors, friends. Any one of them may be reasonably expected to report observations of criminal activity to the police.") (quoting State v. Corbett, 516 P.2d 487, 490 (Or. Ct. App. 1973)).

Furthermore, since the electric meter was located in this area, the Cousinses knew that utility employees would be in the area at least once a month to read the meter. The Cousinses claim that these employees were not "uninvited visitors," but that they were "invited as the result of an easement to which the Cousins voluntarily agreed." The Cousinses, however, could have had no reasonable expectation that such visitors would protect the Cousinses' privacy; the utility employees could potentially report any illegal conduct observed while on the property (as happened in this case). Inviting such persons onto their property further shows that the Cousinses did not take steps to protect the area from observation. See United States v. Domitrovich, 1995 WL 358624, at *1 (9th Cir. 1995) (unpublished) (affirming the district court's conclusion that an area was not curtilage, in part because the defendant "had regularly allowed meter readers access to the area around the home"), aff'g 852 F. Supp. 1460, 1467–71 (E.D. Wash. 1994) ("Meter readers were afforded unrestricted access to the area around the residence while going to and from the meter. . . . [Thus,] the defendant's actions were not entirely consistent with his professed zeal for privacy."). Cf.

United States v. Depew, 8 F.3d 1424, 1428 (9th Cir. 1993) (finding that the fourth Dunn factor weighed in the defendant's favor, in part because he "had a post office box in town and read his own meter so that no postal worker or meter reader came to his premises"), overruled on other grounds by Johnson, 256 F.3d at 913 n.4; State v. Poulos, 942 P.2d 901, 904 n.2 (Or. Ct. App. 1997) (concluding that the defendant had shown an intent to exclude the public, in part because "by agreement with the electric company, defendant read his own meter and reported it to the company").

Allowing meter readers on the premises is not necessarily dispositive, but here the fact that the area was accessed by a walkway and was not enclosed, coupled with the fact that the Defendants knew the area was frequented by a meter reader who might be expected to report observed illegal activity, leads to a conclusion that this fourth factor also weighs against a finding of curtilage.

### 5. Conclusion

As a result of the above analysis, we conclude that Defendants' sideyard did not fall within the curtilage of their home. As a result, law enforcement presence in this area did not violate the Fourth Amendment.

## II. Kurt Cousins's sentencing appeal

Under 21 U.S.C. § 841(b)(1)(B)(vii), a conviction under 21 U.S.C. § 841(a) involving more than 100 marijuana plants is subject to a five-year mandatory minimum sentence. However, a defendant can exempt himself from the

mandatory minimum sentence if he meets the following safety valve

requirements:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
> (2) the defendant did not use violence . . . or possess a firearm or other dangerous weapon . . . in connection with the offense;
> (3) the offense did not result in death or serious bodily injury to any person;
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense . . . and was not engaged in a continuing criminal enterprise . . . ; and
> (5) . . . the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense . . . .

18 U.S.C. § 3553(f)(1)-(5).  If the district court makes these five findings, the

defendant is eligible instead for the range proscribed by the United States

Sentencing Guidelines.

Here, the district court sentenced Kurt Cousins to five years in prison,

pursuant to the statutory mandatory minimum.  If, however, Kurt's criminal

history category had been level I instead of level II, he may have been eligible for

a safety-valve reduction.  See id.  Kurt's criminal history category classification

was due, in part, to a 1996 South Carolina misdemeanor conviction for receiving

stolen goods where he was sentenced to a $500 fine or, in the alternative, to 30

days in prison.[5]  Kurt contends that he was deprived of the right to counsel at

_____

[5]On February 26, 1996, in Greenville County, South Carolina, Kurt was convicted of the misdemeanor offense of receiving stolen goods, pursuant to a

(continued...)

these state court proceedings and that therefore the district court in the instant case should not have included the conviction in his criminal history category calculation.

## A.   Standard of review

We review <u>de novo</u> both the legality of a sentence and the constitutionality of a state court conviction used in sentencing proceedings.  <u>See</u> <u>United States v. Wicks</u>, 995 F.2d 964, 975-76 (10th Cir. 1993).

## B.   Whether a Defendant may collaterally challenge the validity of his state-court conviction at a federal sentencing proceeding

In its answer brief, the Government asserts that it is improper for Kurt to challenge the constitutionality of his prior state court conviction in a federal sentencing proceeding.  The proper route, according to the Government, would have been to challenge the conviction within the South Carolina state court system.

The Supreme Court has held that a defendant may not generally challenge the constitutionality of his prior state court conviction by objecting at a federal sentencing hearing to the use of that prior conviction as part of a sentencing

---

⁵(...continued)
guilty plea.  The written judgment reflects a sentence of 30 days in jail or a $500 fine.  The word "suspended" is circled.  A provision for one month unsupervised probation is crossed out.  The Government stipulated that the South Carolina court effectively imposed a suspended sentence requiring Kurt to pay the $500 fine or, if he did not, to spend 30 days in jail.  There is also no dispute that Kurt was not represented by an attorney during these proceedings.

- 16 -

enhancement.  <u>Custis v. United States</u>, 511 U.S. 485, 487 (1994).  However, an exception to this general rule is that challenges to the constitutionality of a conviction based upon a violation of the right to counsel are permitted in sentencing proceedings, even though the defendant is attacking the prior state conviction collaterally in federal court.  <u>Id.</u>  Thus, on its face, the Government's argument appears to be meritless.

However, there is a slight distinction between the instant case and <u>Custis</u>.  In <u>Custis</u>, the defendant raised his constitutional challenge to the prior state conviction as part of his objections to a sentence enhancement.  511 U.S. at 487.  Here, by contrast, the objection is to the non-application of the safety-valve provision.  That provision does not enhance a sentence; rather, it makes a defendant eligible for exemption from the statutory mandatory minimum.

Thus, while it is clear that a defendant may challenge his state conviction in federal court when it is used to enhance his sentence, the question before us is whether he may do so when he seeks a safety valve exemption from the statutory mandatory minimum to reduce his likely sentence.  In <u>Lewis v. United States</u>, the Court stated: "We recognize, of course, that under the Sixth Amendment an uncounseled felony conviction cannot be used for certain purposes.  The Court, however, has never suggested that an uncounseled conviction is invalid for all purposes."  445 U.S. 55, 66-67 (1980) (citations omitted).  With this in mind, the Court in <u>Lewis</u> held that it was permissible to use an uncounseled conviction for

the purposes of imposing a civil restriction against owning a firearm, even though the conviction could not be used to enhance a criminal sentence. Id. at 67. This was because prohibiting the use of uncounseled convictions in sentencing enhancements is based on a concern about the reliability of an uncounseled conviction. Id. The federal gun laws, by contrast, focus on the mere fact of conviction (or even indictment) in order to keep firearms away from potentially dangerous people. Id.

The instant case is closer to Custis than it is to Lewis. Whether or not we are enhancing a sentence based on a conviction or determining on the basis of that prior conviction that a defendant is not eligible for a safety-valve reduction, the principle concern is whether the prior conviction being used against him is accurate and reliable. There is no principled reason that the Sixth Amendment would protect someone from a sentence enhancement yet deny that person the benefit of an exemption from a mandatory minimum on the basis of the same prior conviction, particularly since both challenges seek to reduce the amount of prison time a defendant has to serve.

Thus, we hold that Kurt may challenge the constitutionality of his state court conviction on Sixth Amendment grounds in a federal sentencing proceeding where the purpose of the challenge is to establish eligibility for safety valve consideration under § 3553(f).

**C.     Whether the South Carolina conviction violated the Sixth Amendment**

In Gideon v. Wainwright, 372 U.S. 335, 344-45 (1963), the Supreme Court held that the Sixth Amendment's guarantee of the right to appointed counsel applies to state criminal prosecutions through the Fourteenth Amendment. Clarifying the scope of Gideon, the Court later held that an indigent defendant must be appointed counsel in any criminal prosecution, regardless of its classification as a misdemeanor or a felony, "that actually leads to imprisonment even for a brief period . . . ." Argersinger v. Hamlin, 407 U.S. 25, 33 (1972). Seven years later, in Scott v. Illinois, 440 U.S. 367 (1979), the Court established the outer limit of the right first enunciated in Argersinger. Id. at 373. Although the statute under which the defendant in Scott was charged authorized up to a one-year jail term, the Court held that the defendant had no right to state-appointed counsel because the sole sentence imposed on him was a $50 fine. Id. at 368, 373-74.

The next major development in this area of law was Alabama v. Shelton, 535 U.S. 654 (2002). The defendant in Shelton was sentenced to 30 days' imprisonment after a conviction for misdemeanor assault. Id. at 658. The trial court suspended that sentence, however, and placed the defendant on two years' unsupervised probation. Id. If the defendant violated his terms of probation, he would be subject to the 30 days' imprisonment. Id. The Court held that a

suspended sentence that may end up in actual deprivation of a person's liberty fit under the Argersinger-Scott "actual imprisonment" rule and thus entitled the defendant to the benefit of counsel. Id. at 674.

The instant case is analogous to Shelton in the sense that the sentence imposed by the South Carolina court was essentially a suspended sentence: either Defendant paid the $500 fine or he went to jail for 30 days. Therefore, by depriving Kurt of the benefit of counsel, South Carolina appears to have violated Kurt's Sixth Amendment rights.

The Government on appeal contends that Shelton does not apply to Kurt's South Carolina conviction because the Supreme Court issued Shelton after Kurt's state court conviction had taken effect and Shelton did not apply retroactively to that conviction. See Teague v. Lane, 489 U.S. 288, 310 (1989) (holding that a "new rule" does not retroactively apply to cases on collateral review unless it falls within one of a narrowly-defined set of exceptions).[6] Thus, argues the government, since the conviction was valid at the time it was made, it could be

---

[6] In Schriro v. Summerlin, 542 U.S. 348 (2004), the Supreme Court recently summarized the types of cases that fall outside the Teague retroactivity bar. Generally speaking, new substantive rules apply retroactively. Id. at 351. "This includes decisions that narrow the scope of a criminal statute by interpreting its terms as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." Id. at 351–52 (citations omitted). New rules of procedure, on the other hand, generally do not apply retroactively, unless they fall into the small set of "watershed rules of criminal procedure," implicating the fundamental fairness and accuracy of the criminal proceeding. Id. at 352.

used for the purposes of denying a safety-valve exemption. See Nichols v. United States, 511 U.S. 738, 748-49 (1994).

However, the Teague bar is not jurisdictional and it may be waived. See Schiro v. Farley, 510 U.S. 222, 228 (1994). In reviewing the record, it appears that the Government did not raise a Teague-style objection to the application of Shelton below. Therefore, we decline to address this issue. See Duckett v. Godinez, 67 F.3d 734, 746, n.6 (9th Cir. 1995); Hanrahan v. Greer, 896 F.2d 241, 245 (7th Cir. 1990).

Having concluded that the South Carolina conviction violated Kurt's Sixth Amendment rights, we must also conclude that it was error for the district court to use this conviction in calculating Kurt's criminal history category.[7]

## CONCLUSION

For the reasons outlined above, we AFFIRM the district court's decision to deny Defendants' motion to suppress. However, we REVERSE Defendant Kurt Cousins's sentence and REMAND for resentencing.

---

[7]This is not to say, of course, that Kurt Cousins necessarily qualifies for a safety valve exception. 18 U.S.C. § 3553(f) presents a five part test. The district court did not address the other four parts given the ruling on Defendant's criminal history. Consequently, we must remand for the district court to consider the other four requirements under § 3553(f) to determine whether Kurt Cousins qualifies for safety valve relief.