**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DONALD PAUL BELL,

Defendant - Appellant.

No. 05-6295

W. D. Oklahoma

(D.C. No. 04-CR-190-R)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **HOLLOWAY,** and **EBEL**, Circuit Judges.

Donald Paul Bell was convicted by a jury on two counts of being a felon in possession of a firearm, and was sentenced to 240 months' imprisonment. On appeal he contends that (1) police officers conducted an unlawful search of a wooded area behind his trailer home; (2) there was insufficient evidence to support the convictions; and (3) he was sentenced in violation of *United States v. Booker*, 543 U.S. 220 (2005). We have jurisdiction under 28 U.S.C. § 1291 and affirm the judgment of the district court, holding that (1) Mr. Bell had no

_____

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

expectation of privacy in the wooded area behind his home, because it was not included with the home's curtilage; (2) the evidence supported the convictions; and (3) the post-*Booker* sentencing did not violate *Booker*.

## I. BACKGROUND

On June 22, 2004, Oklahoma City police officer Aaron Harmon, acting on a tip from a confidential source, went to 4801 South Berryman Road in Oklahoma City looking for Dave Hammons, a federal fugitive. The property is on the west side of Berryman Road. A portion of the property ("the enclosed area") is largely enclosed as follows: The north and south boundaries of the enclosed area are defined by fences that extend from the street a bit more than 50 feet. On the east side (the street side) is a trailer home. A fence abutting the trailer extends north to the northern-boundary fence. Another fence abutting the trailer extends south a few feet to the driveway, which is unobstructed and leads to the interior of the property. There may have been a "No Trespassing" sign on this portion of fence, but it is not clear from the record. A third fence extends from the south side of the driveway to the southern-boundary fence. On the west side of the enclosed area are two buildings. A fence extends north from the northern building to the northern-boundary fence. There are small gaps between the two buildings and between the southern building and a fence that extends south to the southern-boundary fence. To the west of the enclosed area is a "wooded area." R. Vol. 2 at 25. (See diagram.) At oral argument Mr. Bell's attorney suggested that there

was an outer barbed-wire fence that enclosed both the enclosed area and the wooded area. But no mention was made of this fence before the district court, and it is not apparent from the record that such a fence exists.

NORTH

Officer Harmon and fellow officer Ed Grimes entered the property through the driveway to look for Mr. Hammons. There was no response to knocks on the front and back doors of the trailer home. The officers then saw a light on in a travel trailer parked in the wooded area. Officer Grimes went through the gap between the fence and the southern building on the west side of the enclosed area

and knocked on the door of the trailer. There was no response. He then knocked on the door of a second travel trailer in the wooded area, but again no one answered. As he walked back toward the first travel trailer, he passed a third trailer and noticed that the serial-number plate had been removed. The officers wrote down the vehicle identification number (VIN) from another of the trailers and also from a John Deere tractor in the wooded area. A check with the police dispatcher revealed that the trailer and the tractor had been reported stolen.

A search warrant was obtained for the trailer home on the property. The search revealed two handguns and two rifles in the master bedroom. These weapons were the basis for Count 1 of the indictment.

During the search of the trailer home the officers found several items indicating Mr. Bell's ownership of the premises. They included two bills to him at the Berryman address from the Oklahoma Electric Cooperative dated February 4 and March 30, 2004, and a similarly addressed statement from AT&T for the period February 27 to March 26, 2004. Charles Barton, finance manager of the Oklahoma Electric Cooperative, testified at trial that an account had been opened for 4801 South Berryman Road on October 20, 2003, in the name of Don Bell, and that a money order with Mr. Bell's name on it was purchased on August 10, 2004, to pay a bill. A car title issued on June 4, 2004, was also found. The car was registered to Mr. Bell at the same address.

Other trial witnesses also tied Mr. Bell to the property and the firearms. Ricky Ash, who agreed to cooperate after he was arrested on drug and firearms charges, testified that he had been to the home at 4801 South Berryman Road on many occasions. He said that Mr. Bell lived at the house, that Mr. Bell "was there all the time," and that he had seen firearms at the house, all of which belonged to Mr. Bell. R. Vol. 4 at 211. He added that Mr. Bell "was with a firearm all the time." *Id*. at 212. Dave Hammons also testified that Mr. Bell lived at that address, and that he kept a firearm on him "all the time." *Id*. at 267. Both further testified that Mr. Bell often traded drugs for firearms while at that address, and that Mr. Bell kept the home padlocked when no one was there; neither had a key.

In addition, Mr. Hammons, who had been living in a travel trailer on the property since the beginning of June, testified about events on the day of the search. He and his wife were in the travel trailer on June 22 when they saw Mr. Bell and a woman who was staying with him run out of the trailer house and drive off. Suspecting that something was wrong, Mr. Hammons and his wife also fled. He met with Mr. Bell about an hour later and "that's when he told me that the police was coming out there and we needed to stay away from the house." *Id*. at 269.

Officer Harmon testified that he looked for Mr. Bell for approximately three months before finally locating and arresting him. During this time, on

August 26, 2004, Mr. Bell was stopped for a traffic violation by Officer David Carroll of the Choctaw, Oklahoma Police Department. The driver's license he produced was in the name of Wayne Oran Lewis. Mr. Bell consented to a search of the vehicle. Officer Carroll testified at trial that on the front seat next to where the driver would sit he found a "green army-style bag" that contained a pistol and several other items. R. Vol. 3 at 104. "Mr. Lewis" told Officer Carroll that the bag and its contents were not his. At trial another officer identified Mr. Bell as the driver who was calling himself Wayne Lewis. The firearm found during this traffic stop was the basis for Count 2 of the indictment.

## II. DISCUSSION

### A. The Search

Mr. Bell contends that the officers conducted an illegal search on June 22, 2004, by checking the VINs on the trailer and tractor that were in the wooded area. He asserts that once the officers attempting to execute the arrest warrant had concluded that Mr. Hammons was not there, their further investigation violated the Fourth Amendment and tainted the search warrant for the home. We disagree. Because the wooded area was not within the curtilage of the home, the Fourth Amendment provided no protection against the officers' intrusion. *See Oliver v. United States*, 466 U.S. 170, 178 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."); *id*. at 180 ("[O]nly the curtilage,

not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home."). When the area searched is outside the home's curtilage, it is irrelevant whether the officers have trespassed on the property. *See id*. at 182-84 (presence of "No Trespassing" signs and common law of trespass do not govern Fourth Amendment protection).

"[U]ltimate curtilage conclusions are to be reviewed under a *de novo* standard although we continue to review findings of historical facts for clear error." *United States v. Tolase-Cousins*, Nos. 04-2218 & 04-2264, slip. op. at 9 (10th Cir. July 26, 2006) (en banc). The "central component" of the curtilage inquiry

> is whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life. . . . [F]our factors [are] used to determine whether a particular area was within the curtilage of a house: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken by the resident to protect the area from observation.

*Id*. at 10 (panel opinion) (internal quotation marks and citations omitted). We examine each factor in turn. First, the wooded area was not near the home. It was beyond the western-boundary fence, which was approximately 50 feet west of the trailer home. Second, the area was outside the enclosed area. *See United States v. Dunn*, 480 U.S. 294, 302 (1987) ("[I]t is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house."); *Oliver*, 466

U.S. at 182 n.12 ("[F]or most homes, the boundaries of the curtilage will be clearly marked."). Third, there was no evidence at the suppression hearing regarding what the wooded area was used for. Its appearance indicated that it was used to store vehicles and trailers, hardly a private activity associated with the intimacy of a home. Although the officers' observations indicated that someone might have been staying in one of the small travel trailers, Mr. Bell's argument was that the search was conducted within the curtilage of the trailer home, not some other "home" on the premises. Indeed, his attorney made no argument based on occupancy of the travel trailer. Fourth, the wooded area was readily visible to persons on neighboring property. The only artificial obstruction to one's view was the fence between the wooded area and the enclosed area. Considering all these factors, it is apparent that Mr. Bell had no reasonable expectation of privacy in the wooded area. We hold that the wooded area was not within the trailer home's curtilage. *Cf. Dunn*, 480 U.S. 294 (barn that was 60 yards from the house, outside the main fence surrounding the house but within another fence on the property, not used for private activities, and not protected from observation, was not within the curtilage of the home). Hence, the officers' intrusion did not violate the Fourth Amendment.

**B.      Sufficiency of the Evidence**

Mr. Bell's claims of insufficient evidence have no merit. We review these claims de novo, "viewing the evidence and the reasonable inferences to be drawn

therefrom in the light most favorable to the government," and reversing the conviction "only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Toles*, 297 F.3d 959, 968 (10th Cir. 2002) (internal quotation marks omitted). "[W]e do not question the jury's credibility determinations or its conclusions about the weight of the evidence." *United States v. Norman*, 388 F.3d 1337, 1340 (10th Cir. 2004) (internal quotation marks omitted).

Both guilty verdicts were for violations of 18 U.S.C. § 922(g)(1). "[I]n order to prove a violation of § 922(g)(1), the government must establish the following elements beyond a reasonable doubt: (1) the defendant was previously convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm or ammunition; and (3) the possession was in or affecting interstate commerce." *Id*. For each verdict Mr. Bell challenges only the second element. "'Possession' can be either actual or constructive under § 922(g)(1). Constructive possession occurs when a person knowingly holds ownership, dominion or control over the object and premises where it is found." *Id*. (internal citation and quotation marks omitted)

As to Count 1, Mr. Bell contends that there was insufficient evidence to connect him to the firearms that were found inside the trailer home. But several documents found in the trailer indicated his dominion over the premises. And Ricky Ash and Dave Hammons testified that Mr. Bell lived there, always had a

-9-

firearm in his possession, and often traded drugs for firearms at that location. Speaking of the master bedroom where the firearms were found, Mr. Hammons testified that Mr. Bell "hardly ever let anybody in there by their self," because there was "[u]sually money in there or dope." R. Vol. 4 at 258. Both Mr. Ash and Mr. Hammons also testified that Mr. Bell kept the home padlocked when no one was there, and that neither had a key; and Mr. Hammons testified that Mr. Bell was there immediately before the police arrived on June 22. This evidence was more than sufficient to convict Mr. Bell of possessing the firearms found in the home.

The evidence was also sufficient on Count 2. A firearm was found in a bag on the bench seat next to where Mr. Bell had been sitting. He denied ownership of the contents of the bag, saying that he had just purchased the truck. But the jury could easily have found his story improbable. There was no one else in the truck, and Mr. Bell presented the officers with a fake name and driver's license. Further, there was testimony that Mr. Bell always carried a firearm.

**C. Sentence**

Finally, Mr. Bell contends that at sentencing the court conducted a "mini-trial of a substantive offense for the purpose of enhancing the sentence," in violation of *Booker*. Aplt. Br. at 37. But there was no *Booker* error. *Booker* held that when a fact is used to increase a sentence mandatorily, the fact must be admitted by the defendant or found by a jury beyond a reasonable doubt. 543

-10-

U.S. at 224. Mr. Bell's sentencing occurred after *Booker* was decided, and the district court clearly stated "that the guidelines are advisory and they're not mandatory." R. Vol. 5 at 63. Accordingly, there was no requirement that sentencing factors be found by a jury. *See United States v. Dalton*, 409 F.3d 1247, 1252 (10th Cir. 2005) (judicial fact-finding is unconstitutional after *Booker* "only when it operates to increase a defendant's sentence *mandatorily*."). Mr. Bell raises no other challenges to his sentence.

## III.    CONCLUSION

We AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge