**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 8, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LANORVIS DEWAYNE BROWN,

Defendant - Appellant.

No. 05-6080
(D. C. No. CR-03-244-T)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before, **TACHA**, Chief Circuit Judge, **HENRY**, and **McCONNELL**, Circuit Judges.

---

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Following a jury trial, Defendant-Appellant Lanorvis D. Brown was convicted of producing counterfeit currency in violation of 18 U.S.C. § 471, and passing counterfeit currency with the intent to defraud in violation of 18 U.S.C. § 472. The District Court

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sentenced him to 57 months' imprisonment. Mr. Brown now appeals both his conviction and sentence on a variety of grounds. We have jurisdiction under 28 U.S.C. § 1291 and for the reasons discussed below, we AFFIRM.

## I. BACKGROUND

On September 23, 2003, Oklahoma City police arrested two suspects for attempting to pass counterfeit Federal Reserve Notes. The suspects informed United States Secret Service agents at the scene that they obtained the counterfeit bills from a man named "D" (who was later identified as Mr. Brown), and told them the address of the apartment where they claimed "D" produced the counterfeit bills the night before. The Secret Service agents immediately arranged surveillance of the apartment complex, although it was after 2:00 a.m. By 2:45 a.m., two Secret Service agents and three Oklahoma City Police officers arrived at the apartment; they noticed that the lights were on and there was movement inside the apartment. They continued to observe the apartment until approximately 3:15 a.m., when they concluded that someone was awake. The surveillance team then went to the apartment to conduct a "knock and talk."

Special Agent Chrisman and Oklahoma City Police Officer Lieutenant Michael Kelly knocked on the apartment door; the other agent and officers stayed out of view so as not to overwhelm the person who came to the door. According to the Government's witnesses at a suppression hearing, the following events took place: Approximately thirty seconds after Special Agent Chrisman and Lieutenant Kelly knocked, Rebecca Boone answered the door fully dressed. The television was on inside the apartment. Special

Agent Chrisman asked Ms. Boone whether Mr. Brown was there, and she said that he had just left to run some errands. Special Agent Chrisman then informed Ms. Boone that Mr. Brown's name had come up in an investigation of counterfeit currency and asked whether he could come inside to talk with her. She agreed. At this point, the five-member surveillance team entered the apartment. Special Agent Chrisman asked whether the other officers could look around the apartment for Mr. Brown. Again, she agreed, stating, "Sure, look around." Ms. Boone later gave the agents and officers permission to search the apartment for guns, drugs, and a printer used to print counterfeit money.

While the agents were still speaking with Ms. Boone and her roommate,[1] who was also awake in the apartment, Mr. Brown and three others arrived. Special Agent Chrisman informed Mr. Brown that they were there investigating counterfeit currency and asked him if he minded speaking with them about the matter. Mr. Brown agreed, and the pair retreated into one of the bedrooms in the apartment. Special Agent Chrisman informed Mr. Brown of the allegations against him and read him his *Miranda* rights. Mr. Brown then admitted that he printed money on a printer he kept in Ms. Boone's apartment, but that he had taken the printer to his brother's house earlier that morning. He also admitted that counterfeit money could be found in the apartment, along with his .22-caliber rifle and a box of .22-caliber hollow-point bullets. He then gave the officers

---

[1]Shelly Dennis, Ms. Boone's roommate, corroborated much of Special Agent's Chrisman's testimony. She testified that none of the officers acted inappropriately, none had their weapons drawn, and none of them threatened anyone in the apartment.

permission to search the apartment for the items. The officers located seventy-six

counterfeit $100 bills, the .22-caliber gun and ammunition, as well as an additional box of

.357-caliber ammunition. Mr. Brown was taken into custody that night and charged with

counterfeiting and related charges under Oklahoma law. Five days later, Mr. Brown was

released on bond.

On November 19, 2003 a federal grand jury returned a three-count indictment

against Mr. Brown.[2] The first two counts consisted of the counterfeiting

charges—making and passing counterfeit currency with the intent to defraud in violation

of 18 U.S.C. §§ 471 and 472. Count Three charged Mr. Brown with being a felon in

possession of a firearm in violation of 18 U.S.C. § 922(g)(1). An arrest warrant was

issued, and two Secret Service agents unsuccessfully attempted to execute the warrant at

Mr. Brown's last known address. They also tried to execute the warrant at the address of

a relative—again, to no avail. Mr. Brown continued to elude apprehension until February

2004, when the Secret Service intensified its search. To that end, Secret Service agents

contacted a number of Mr. Brown's family and friends, conducted surveillance of the

motels where they believed he was staying, and left several messages on Ms. Boone's and

Mr. Brown's cellular telephones. The messages left for Mr. Brown advised him that there

was a warrant for his arrest and asked him to surrender.

Thereafter, Mr. Brown changed the outgoing message on his voicemail; the new

---

[2]The state counterfeiting charges were never pursued.

message said, "[Q]uit leaving messages on my phone. I know you guys are looking for me. You're going to look silly coming through the door. This is the last door you'll ever kick in." On February 9, 2004 Mr. Brown was taken into custody in Sierra Blanca, Texas where he and Ms. Boone were identified as they were attempting to cross the Mexican border.

Mr. Brown subsequently filed a motion to suppress evidence obtained as a result of the "knock and talk" at Ms. Boone's apartment. He also filed a motion to exclude evidence of his flight to avoid prosecution. The District Court denied the motions and the parties proceeded to trial. A jury convicted Mr. Brown of both counterfeiting offenses but acquitted him of the firearm offense.

The probation office prepared a presentence report ("PSR"), calculating a base offense level of 15 based on Mr. Brown's conviction for manufacturing counterfeit currency. *See* U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 2B5.1(b)(3).[3] The PSR also indicated that two two-level sentence enhancements were warranted: First, because Mr. Brown possessed a firearm in connection with a counterfeiting offense, *see* U.S.S.G. § 2B5.1(b)(4), and second, because Mr. Brown

---

[3]More specifically, the base offense level for a conviction under 18 U.S.C. § 471 is 9. U.S.S.G. § 2B5.1(a). When the total loss exceeds $10,000, as it did in this case, two offense levels are added. U.S.S.G. §§ 2B5.1(b)(1) and 2B1.1. When the defendant also manufactured or produced the counterfeit currency, or possessed a device used for counterfeiting, another two offense levels are added. U.S.S.G. § 2B5.1(b)(2)(A). Here, this resulted in a total offense level of 13. As explained in U.S.S.G. § 2B5.1(b)(3), however, when § 2B5.1(b)(2)(A) applies "and the offense level determined under that subsection is less than 15, increase to level 15."

obstructed the administration of justice, *see* U.S.S.G. § 3C1.1. Accordingly, the PSR

calculated a total offense level of 19. This offense level, when combined with Mr.

Brown's criminal history category of IV, produced an advisory sentencing range of 46 to

57 months' imprisonment. The District Court agreed that a base offense level of fifteen

was proper and that the firearm and obstruction of justice enhancements were warranted.

It then sentenced Mr. Brown to 57 months.

Mr. Brown now appeals the District Court's disposition of his pretrial suppression

motions and the District Court's imposition of the firearm and obstruction of justice

enhancements. We address each in turn.

## II. DISCUSSION

A.    The District Court Properly Denied Mr. Brown's Motions to Suppress Evidence.

1.    *Evidence obtained as a result of the "knock and talk"*

Mr. Brown first argues that the District Court should have suppressed all evidence,

including his confession, obtained at Ms. Boone's apartment because the warrantless

entry and search violated the Fourth Amendment.[4] The District Court found that Ms.

Boone consented to the law enforcement officers' entry and search of the apartment. We

review the reasonableness of a warrantless entry and search de novo. *United States v.*

---

[4]Because we uphold the District Court's conclusion that valid consent was given, we need not address the Government's contention that Mr. Brown lacks adequate interest in the apartment to raise a Fourth Amendment challenge to the search. *See Minnesota v. Carter,* 525 U.S. 83, 88 (1998) (observing that "standing" to raise a claim related to a search is a matter of substantive Fourth Amendment law and not a jurisdictional requirement).

*Gutierrez-Hermosillo*, 142 F.3d 1225, 1229 (10th Cir. 1998). "[I]t is well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Pena*, 143 F.3d 1363, 1365–66 (10th Cir. 1998) (internal quotations omitted). If the officers entered and searched the premises pursuant to valid consent, then such entry and search is reasonable under the Fourth Amendment. *See Gutierrez-Hermosillo*, 142 F.3d at 1229–30. "Valid consent is that which is 'freely and voluntarily given.'" *Pena*, 143 F.3d at 1366 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973)). Whether consent to search was in fact "voluntary" is a question of fact to be determined from the totality of all the circumstances. *Id.*

The District Court found no evidence of physical mistreatment or violence on the part of the law enforcement officers, no evidence of promises or inducements, and no evidence of deception or trickery. Furthermore, Ms. Boone did not claim, nor was there any evidence to support a conclusion, that her mental condition or capacity to consent was limited in any way.[5] Finally, although Ms. Boone testified that she was asleep when the agents and officers arrived and that they entered the apartment without consent and with their weapons drawn, the court found that her testimony lacked credibility. *See*

---

[5]We have stated that factors to be considered in determining whether consent is freely and voluntarily given include: "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant . . . ." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).

*United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) ("The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court.").[6] On appeal, Mr. Brown does not contest any of these factual findings. Instead, he argues that because the "knock and talk" leading to the entry into Ms. Boone's apartment occurred at 3:15 a.m., and because five law enforcement officers were present at the scene, the circumstances were "inherently coercive."

We have previously rejected the notion that, in the absence of evidence of force or threats, contact with an individual at her home in the early morning hours is inherently coercive. *See United States v. Abdenbi,* 361 F.3d 1282, 1288 (10th Cir. 2004). Nor is the presence of multiple officers inherently coercive or dispositive to the inquiry. *Id.* Mr. Brown, however, relies on the Seventh Circuit's decision in *United States v. Jerez* which notes "the special vulnerability of those awakened in the night by a police intrusion at their dwelling place." 108 F.3d 684, 690 (7th Cir. 1997); *see also Harless v. Turner*, 456 F.2d 1337, 1338 (10th Cir. 1972) (finding that consent to search was not voluntarily given when two officers entered the suspect's home at 1:45 a.m., routed him out of bed, and questioned

---

[6]The District Court's credibility determination is bolstered by evidence that Ms. Boone was not truthful on at least one other subject. Specifically, Ms. Boone testified that she had not spoken with Mr. Brown on the telephone after her bond was set because it was a condition of her bond that she would not do so. There was evidence, however, that Mr. Brown placed numerous calls to both her cellular telephone and her place of work, and that some of the calls lasted fifteen minutes.

him before seeking consent); *Villano v. United States*, 310 F.2d 680, 684 (10th Cir. 1962) (finding that consent to search was not voluntarily given, in part because officers awakened suspect in his home before dawn) *abrogated on other grounds by Schneckloth*, 412 U.S. at 218. Unlike the circumstances in *Jerez*, *Harless*, and *Villano*, the surveillance team in this case was able to establish that someone in the apartment was awake prior to initiating the "knock and talk," a conclusion that was validated when Ms. Boone answered the door, fully dressed, within thirty seconds, and a television was on in the background. Based on the foregoing, we conclude that the District Court did not clearly err in finding that Ms. Boone voluntarily consented to the search of the apartment.

Nevertheless, Mr. Brown argues that even if the consent was valid, the search performed exceeded the scope of the consent given. Specifically, he argues that the consent extended only to a search for Mr. Brown and that once it was determined that Mr. Brown was not present the officers were required to leave the premises. "Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous." *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004). Despite Mr. Brown's assertions to the contrary, the District Court found that the officers sought and obtained from Ms. Boone consent not only to search the apartment for him, but also to search for the printer, the counterfeit money, weapons, and narcotics that Ms. Boone indicated were in the apartment. This finding is not clearly erroneous. Moreover, the agents and officers were still lawfully on the premises—Ms. Boone agreed

to speak with them—when Mr. Brown arrived at the apartment; at that point, Mr. Brown consented to a search of the apartment, which turned up the incriminating evidence. Accordingly, we conclude the District Court did not err in admitting the evidence.

2.    *Evidence of flight to avoid prosecution*

Mr. Brown asserts that the District Court erred in admitting evidence that he fled from prosecution. We have long acknowledged that "the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Martinez*, 681 F.2d 1248, 1259 (10th Cir. 1982). Whether evidence of a defendant's flight is admissible is a matter committed to the discretion of the trial court. *United States v. Akers*, 215 F.3d 1089, 1102 (10th Cir. 2000). "[F]light evidence carries with it a strong presumption of admissibility," and we will not reverse the decision of the district court absent a showing of an abuse of discretion. *Martinez*, 681 F.2d at 1256, 1258; *Akers*, 215 F.3d at 1102.

Mr. Brown contends that his conduct cannot be characterized as "flight" because the Government failed to establish that he was aware either that a grand jury returned an indictment against him on November 19, 2003 or that a warrant was issued for his arrest. This Circuit, however, has never required evidence of a direct causal link between an accused's knowledge of an indictment or warrant and the accused's flight. *See, e.g.*, *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir. 1987) (accused fled after being interviewed by police regarding crime); *Martinez*, 681 F.2d at 1254 (defendant fled soon

- 10 -

after crime was committed and after news reports identified him as a suspect). Rather, the admissibility of the evidence turns on whether it gives rise to a permissible inference of the accused's consciousness of guilt, and therefore guilt itself. *Martinez*, 681 F.2d at 1256; *Akers*, 215 F.3d at 1103 (stating that guilt of the charged offense need not be the only possible inference to be drawn from the evidence of the accused's flight; it need only be a permissible one). The evidence in this case established that after Mr. Brown was released from state custody on bond on September 29, 2003, he took steps to conceal his identity, stayed in various motels in the metropolitan area, and ultimately traveled to Mexico. There is no dispute that Mr. Brown knew that federal authorities were investigating him for the crimes charged—he was interviewed by Secret Service agents concerning his counterfeiting activity, he signed a written confession pertaining to the same activities, and shortly before he was apprehended at the border, Secret Service agents left messages on his voicemail indicating that a warrant had issued for his arrest, in response to which Mr. Brown changed his outgoing message to indicate that he could not be caught. The District Court did not abuse its discretion in concluding this evidence gives rise to a permissible inference of guilt of the crime charged. Furthermore, we are satisfied that the risk of unfair prejudice did not substantially outweigh the probative value of this evidence. *See* Fed. R. Evid. 403.

C.    The District Court Properly Applied the Sentencing Guidelines

Mr. Brown next argues that the District Court erred in imposing sentencing enhancements for his possession of a firearm in connection with a counterfeiting offense,

*see* U.S.S.G. § 2B5.1(b)(4), and for obstruction of justice, *see* U.S.S.G. § 3C1.1. In analyzing a district court's application of the Guidelines, we review factual findings for clear error and questions of law de novo. *United States v. Apperson*, 441 F.3d 1162, 1210 (10th Cir. 2006). "On clear error review, we may reverse only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Tolase-Cousins*, 440 F.3d 1237, 1242 (10th Cir. 2006) (internal quotation marks omitted).

1.      *Enhancement for possession of a firearm*

Mr. Brown challenges the District Court's application of U.S.S.G. § 2B5.1(b)(4), which provides that if a firearm was possessed "in connection with" the counterfeiting offense, the defendant's offense level will be increased by two levels. U.S.S.G. §2B5.1(b)(4). Specifically, he argues that there was insufficient evidence that he possessed the firearm "in connection with" the counterfeiting offense.[7] A weapon is possessed "in connection with" counterfeiting when "the weapon in question facilitates or has the potential to facilitate" the underlying offense. *See United States v. Gomez-*

---

[7]Mr. Brown also argues that because he was acquitted at trial of being a felon in possession of a firearm, the District Court violated the Sixth Amendment in imposing the enhancement. He candidly acknowledges, however, that current Supreme Court and Tenth Circuit precedent forecloses his argument. *See United States v. Watts*, 519 U.S. 148, 157 (1997); *United States v. Magallanez,* 408 F.3d 672, 684 (10th Cir. 2005). He raises the argument here in order to preserve the issue for possible review by the Supreme Court. The issue is preserved.

*Arrellano*, 5 F.3d 464, 466–67 (10th Cir. 1993).[8]  The government does not meet this burden, however, if it shows only a coincidental link between the firearm and the crime, or if the firearm is completely unrelated to the offense.  *Id.*

At the sentencing hearing, the District Court found that during Special Agent Chrisman's interview of Mr. Brown in Ms. Boone's apartment, Mr. Brown admitted that he possessed the rifle; he admitted he knew that as a convicted felon, he was not allowed to possess the rifle; he laughingly said that he used it for hunting; and at that time, no one else in the apartment claimed ownership of the rifle.  Moreover, it is undisputed that Mr. Brown created and distributed counterfeit money at the apartment where the gun was found.  The apartment was not Mr. Brown's residence, but was instead a place where he routinely engaged in criminal activity.  The District Court concluded that the rifle's proximity to the fruits and instrumentalities of the counterfeiting offense justifies the conclusion that the rifle was used in connection with the charged offense.  Based on these facts, the District Court's conclusion that the firearm at least had the *potential to facilitate* the counterfeiting offense is not clearly erroneous.  *See United States v. Matos-*

---

[8]Although *Gomez-Arrellano* involved an enhancement under § 2K2.1(b)(5), which calls for an enhancement when a firearm is possessed "in connection with another felony offense,"—in that case, a drug trafficking offense—nothing in the Guidelines suggests that a different definition of "in connection with" should apply to an enhancement under U.S.S.G. § 2B5.1(b)(4).  *See United States v. Gregory*, 345 F.3d 225, 229 n.2 (3d Cir. 2003) (applying the same definition of "in connection with" to enhancements under both § 2K2.1(b)(5) and § 2B5.1(b)(4)); *see also United States v. Taylor*, 413 F.3d 1146, 1154 (10th Cir. 2005) (applying the same definition of "in connection with" to enhancements under both § 2K2.1(b)(5) and § 4B1.4(b)(3)).

*Rodriguez*, 188 F.3d 1300, 1309 (11th Cir. 1999) (upholding application of §2B5.1(b)(4) because firearms are used in counterfeiting offenses, as in drug offenses, to protect the defendant's merchandise).

### 2. *Enhancement for obstruction of justice*

Finally, we turn to Mr. Brown's challenge to the District Court's application of a two-level enhancement to his base offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1. The Guidelines provide for a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. "Obstruction of justice includes perjured testimony at trial." *United States v. Chavez*, 229 F.3d 946, 955 (10th Cir. 2000) (citing U.S.S.G. § 3C1.1, cmt. n.4(b)). To establish that a defendant committed perjury, the district court must find that: (1) the defendant gave false testimony while under oath; (2) that the false testimony concerned a material matter; and (3) that the false testimony was willful and not the result of confusion, mistake, or faulty memory. *Id.* at 955. In reviewing the district court's determination, we defer to the court's ability to judge the credibility of witnesses. *United States v. Weller*, 238 F.3d 1215, 1222 (10th Cir. 2001).

The District Court found a number of inconsistencies between Mr. Brown's testimony at trial and the testimony of other more credible sources. For instance, Mr. Brown testified at trial—contrary to his previous oral and written confessions—that he never made or passed counterfeit currency. Giving proper deference to the District

Court's determination, we find ample evidence to suggest that Mr. Brown committed perjury with respect to the testimony in question. Accordingly, the District Court did not err in applying the enhancement.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Brown's conviction and sentence.

ENTERED FOR THE COURT,


Deanell Reece Tacha
Chief Circuit Judge